46007. AMERICAN SUBCONTRACTORS ASSOCIATION, GEORGIA CHAPTER, INC. v. CITY OF ATLANTA et al.
(376 SE2d 662)

HUNT, Justice.

This case presents another challenge to the validity of an affirmative action program of the City of Atlanta. See *Ga. Branch v. City of Atlanta*, 253 Ga. 397 (321 SE2d 325) (1984). The program provides favored treatment for minority and female-owned business enterprises in the award of city contracts. Plaintiff (ASA), an association of largely non-minority and non-female contractors, sought, under state statutory and constitutional grounds, declaratory and injunctive relief against the affirmative action program established by a City of Atlanta charter amendment and an administrative order of the mayor. The parties filed cross-motions for summary judgment, each of which was granted in part and denied in part. The trial court ruled the affirmative action program valid except for the inclusion of non-black minorities, but required extensive findings by the city in order to con-

tinue the program.[1] The ASA appeals and we reverse.

In effect this is the second appearance of this case. In *Ga. Branch*, supra, we reviewed the city's 1982 Minority and Female Business Enterprises (MFBE) Ordinance and, without reaching the constitutional challenges to the ordinance, held it void on the ground that it violated the state legislative requirement, set forth in the city's charter, that all contracts be awarded to the "lowest and/or best bidder." Id. at 399. "The MFBE ordinance requiring certain percentages of contracts measured in dollar value be awarded on the basis of race and sex conflicts with the legislative intent and purpose embodied in the bid requirement." Id. After our decision in *Ga. Branch* in October 1984, the city moved to correct the deficiencies in its affirmative action program. The mayor announced a moratorium on bidding on all city contracts except in emergency situations. In December 1984, the city council enacted by ordinance a charter amendment redefining the term "lowest and/or best bidder" in the city charter to include a bidder's compliance with a city minority and female business participation program. Immediately thereafter, the mayor announced Administrative Order 84-5 setting forth the city's Minority and Female Business Participation Program (MFBE). The program is identical to that reviewed in *Ga. Branch*, supra:

> . . . a project is eligible if the city: spends $25,000 or more for construction or repair to real estate; spends funds for professional or consultant services where work by more than one professional is anticipated; or, grants concession rights in excess of $25,000 per annum in value. A minority business enterprise (MBE) is defined as a business entity of which at least 51 percent of the ownership and control is by minority persons. The same percentage of ownership and control is established for a female business enterprise (FBE).

Id. at 397. The MFBE does not have an expiration date. The mayor is required to set separate goals annually for MBE and FBE participation, after first addressing specific criteria, including a forecast of eligible projects and the number of MBE firms available. There is no geographic limit to the MFBE; an otherwise qualified MBE from anywhere in the United States can avail itself of the annual "goal" established by the mayor for MBE participation. The mayor's order provides that bidders will not be awarded contracts if their bids fail to identify minority and female businesses by name, scope and dollar

---

[1] We find no authority for the trial court's order requiring future findings by the city in order to continue to implement the program and the record is silent as to whether the city has made these findings. We treat the trial court's order as affirming the program.

value of work, sufficient to meet the goal established by the mayor. The order further provides for penalties if a contract is awarded to a party who subsequently fails to comply with the order's terms. A waiver of the minority provisions is permitted where the bidder shows he has made a good faith but unsuccessful effort to comply. The goal for 1985 was set by the mayor at 35 percent.[2]

1. ASA challenges the constitutionality of the MFBE under the equal protection clause of our state constitution which provides: "Protection to person and property is the paramount duty of government and shall be impartial and complete. No person shall be denied the equal protection of the laws." Art. I, Sec. I, Par. II.[3] In determining the validity of the MFBE in this case we reserve the question of whether any governmental program favoring a particular race is unconstitutional per se under the equal protection clause of our state constitution.[4] See *City of Richmond v. J. A. Croson Co.,* ___ U. S. ___ (57 U.S.L.W. 4132, 4146-4148, decided Jan. 23, 1989) (Justice Scalia concurring in the judgment). Assuming without deciding the MFBE is constitutional on its face, we apply a strict scrutiny standard, the appropriateness of which is conceded by the parties, to analyze the validity of this particular program. *City of Richmond,* supra. In *City of Richmond,* the U. S. Supreme Court invalidated under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, Richmond's "minority set-aside" program for city construction contracts. Like the Richmond plan, there is no question the MFBE denies certain citizens the opportunity to compete for a fixed percentage of public contracts based solely on their race. "To whatever racial group these citizens belong, their 'personal rights' to be treated with equal dignity and respect are implicated by a rigid rule erecting race as the sole criterion in an aspect of public decision-making." *City of Richmond,* supra at 4139. In *City of Richmond,* the majority, in an opinion authored by Justice O'Connor, reaffirmed the plurality opinion in *Wygant v. Jackson Bd. of Education,* 476 U. S. 267 (106 SC 1842, 1846-49, 90 LE2d 260) (1986) that a "strict scrutiny" test applies to *any* classification based on race regardless of its stated justification as benign or remedial. Id. at 4139. See also *Wy-*

---

[2] The parties stipulated there was no issue of female business enterprise before the trial court and, accordingly, we do not address that issue. Also, no issue is raised in this appeal regarding the trial court's ruling that the MFBE was invalid to the extent it promoted minority groups other than blacks.

[3] We do not reach the question of whether the MFBE could withstand a challenge under paragraph 4 of the city's Bill of Rights which provides: "The City of Atlanta shall not, directly or indirectly, discriminate among persons because of race, religion, sex or national origin." Ga. L. 1973, p. 2189.

[4] ASA and the various amici do not contend that *any* race-conscious program is unconstitutional per se under our state constitution.

*gant,* supra, 106 SC at 1846.

Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are "benign" or "remedial" and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics. Indeed, the purpose of strict scrutiny is to "smoke out" illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool. The test also ensures that the means chosen "fit" this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype.

Classifications based on race carry a danger of stigmatic harm. Unless they are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to a politics of racial hostility.

*City of Richmond,* supra at 4139.

Applying a strict scrutiny analysis, we look to: (1) whether the legislation is within the power of the enacting authority, (2) whether there is convincing evidence of prior discrimination, and (3) whether the affirmative action program is sufficiently narrowly tailored to address the effects of past discrimination. *City of Richmond,* supra; *Wygant,* supra; *Fullilove v. Klutznick,* 448 U. S. 448 (100 SC 2758, 2785, 65 LE2d 902) (1980) (Justice Powell concurring). Our holding is based on the second and third prongs of the test, and accordingly, we do not address the first prong: whether the legislation is within the power of the enacting authority.[5]

We first look to whether in this case the city had a " 'strong basis in evidence for its conclusion that remedial action was necessary.' " Id. at 4140. Like the "findings" offered in support of the Richmond

---

[5] We note the charter amendment only provides that in determining the "lowest and/or best bidder" the city may consider a bidder's compliance with a minority and female business participation program. Nowhere in the charter is the mayor directed to establish such a program or provided with any criteria for establishing such a program. Assuming the city, acting through its council, is authorized "to remedy private discrimination, if it identifies that discrimination with the particularity required by the Fourteenth Amendment," see *City of Richmond,* supra at 4138, the mayor, as an officer of a municipal corporation, is authorized to exercise only such power as expressly granted him or necessarily implied from any grant of power. *City of Midway v. Midway Nursing &c. Center,* 230 Ga. 77, 78 (195 SE2d 452) (1973). Here, the mayor had no mandate to enact a minority business program, and we question whether those powers can be otherwise implied to authorize the unilateral issuance of the MFBE set out in Order 84-5.

plan, the evidence offered by the city is inadequate to justify the MFBE. "There is nothing approaching a prima facie case of constitutional or statutory violation by *anyone* in the [Atlanta] construction industry." Id. at 4140. "The city points to no evidence that qualified minority contractors have been passed over for city contracts or subcontracts, either as a group or in any individual case." Id. at 4143. Indeed, city witnesses testified they were unaware of any instance of discrimination against a black or female contractor. As evidence in support of the MFBE, the city argues that it relied upon two studies, a 1977 Dept. of Commerce study and a Voter Education Project study on discrimination against black-owned businesses in Georgia, Annual Minority Participation Reports prepared by the city's Contract Compliance Officer, and public hearings held in April 1981 and February 1982.[6] The studies, however, do not support the city's conclusion that remedial action for black contractors was necessary. Rather, they present a broad overview of national and statewide black employment trends and illustrate, at most, a general under-utilization of black contractors in the Atlanta area. Witnesses for the city, when examined about these studies, suggested a host of non-racial factors affecting the under-utilization of black contractors such as: lack of insurance and bonding capability, lack of cash flow because "the city doesn't pay very swiftly," and practices of not making information available to all bidders prior to contracting. It is likely that these factors face a member of any racial group attempting to establish a new business enterprise. Id. at 4140.

Moreover, the city's own Minority Participation Reports belie the city's claim of a need for the MFBE, and boast of a significant improvement in the city's use of MBE's *prior* to the initial enactment of the MFBE Ordinance voided in *Ga. Branch v. City of Atlanta,* supra. The 1980 report states, "We are pleased to report that Minority Business Enterprises participated in 29 percent of [all city contracting] activities," while the 1981 report states that MBE's participated in 41.3 percent of all city contracts. The city points to statistics for 1973, showing minority participation in city contracts at .13 percent. However, as in *City of Richmond,* this figure is meaningless because there is no data for that period indicating the number of minority contractors capable of performing the work.

The evidence at the two public hearings provides no support for the MFBE. In one, 34 people spoke, "most of whom favored the adop-

---

[6] In its supplemental brief the city requests that this case be remanded to the trial court for additional evidence of discrimination, arguing that *City of Richmond* requires evidence of a different kind from its predecessors. This argument misses the point. It is the city, not the court, which must make particularized findings of past discrimination *before* enacting a program based on racial preference.

tion of MBE/FBE legislation." In the second, one councilman related his view that MBE's were under-represented, and the city's Contract Compliance Officer gave a statement that it is "assumed" minorities have been discriminated against in city contracting. "These statements are of little probative value in establishing identified discrimination in the [city] construction industry." Id. at 4141.

> The factfinding process of legislative bodies is generally entitled to a presumption of regularity and deferential review by the judiciary. [Cit.] But when a legislative body chooses to employ a suspect classification, it cannot rest upon a generalized assertion as to the classification's relevance to its goals. [Cit.] . . . The history of racial classifications in this country suggests that blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis. [Cit.]

Id. at 4141. The city's "factual" support for the MFBE consists of little more than generalized assertions of under-utilization of black contractors in Atlanta, and no evidence of discrimination against black contractors. More important, its own studies indicate significant improvement in the use of black contractors prior to implementation of the MFBE, strongly militating against any need for the MFBE. Under these circumstances, the city has not demonstrated " 'a strong basis in evidence for its conclusion that remedial action was necessary.' " Id. at 4140.[7]

2. Nor is the MFBE "narrowly tailored" to remedy prior discrimination. First, like the program reviewed in *City of Richmond*, the MFBE is not linked to identified discrimination in any way. Id. at 4142. In a footnote to the *Wygant* opinion, Justice Powell noted:

> The term 'narrowly tailored,' so frequently used in our cases, has acquired a secondary meaning. More specifically,

---

[7] The MFBE established by the Mayor's Administrative Order granted preferences not only to blacks but to other minorities including Hispanics, Asian-Americans, American Indians, Eskimos and Aleutians. The trial court invalidated any preference to non-black minorities because there was no evidence of discrimination against any of those designated groups. While there is no issue in this appeal regarding the validity of the MFBE as applied to non-black minorities, the gross overinclusiveness of the City's racial preference impugns the City's claim that the MFBE was motivated for remedial purposes. Id. at 4142. "If a [35%] set-aside was 'narrowly tailored' to compensate black contractors for past discrimination, one may legitimately ask why they are forced to share this 'remedial relief' with an Aleut citizen who moves to [Atlanta] tomorrow? [The gross overinclusion of racial groups] 'further illustrates the undifferentiated nature of the plan'. . . 'Such programs leave one with the sense that the racial and ethnic groups favored by the set-aside were added without attention to whether their inclusion was justified by evidence of past discrimination.' " Id. at 4142.

as commentators have indicated, the term may be used to require consideration whether lawful alternative or less restrictive means could have been used.

*Wygant,* supra at 1850 n. 6. As in *City of Richmond,* many of the barriers to minority participation in the construction industry relied on by the city to justify the MFBE appear to be race-neutral. "If MBEs disproportionately lack capital or cannot meet bonding requirements, a race-neutral program of city financing for small firms would, *a fortiori,* lead to greater minority participation." *City of Richmond,* supra at 4142. Indeed, two of the principal witnesses for the city, a city attorney and a former director of the city's Office of Contract Compliance, testified the problems faced by minority and female contractors in obtaining work were not primarily racial, but, rather, were due to such non-racial factors as: lack of insurance and bonding capability, lack of cash flow due to the city's practice of slow payment, and problems with the city not making information available to all bidders prior to contracting. Both witnesses acknowledged these problems could be ameliorated by alternate remedies to the MFBE such as improving city purchasing and payment procedures, requiring full disclosure of all bid information, relaxing insurance and bonding requirements, and providing loan assistance, and stated the city had taken steps to implement some of these alternate remedies. However, it is uncontroverted that the city did not consider whether these alternate remedies *in themselves* might serve the MFBE's purposes. It is apparent the city had available to it less intrusive means of accomplishing the MFBE's race-conscious purposes but had not fully explored those less intrusive means as possibly eliminating any need for the MFBE.

Further, the annual "goal" to be set by the mayor for MBE's cannot be said to be narrowly tailored. We note first that the semantic distinction between "goal" and "quota" is "beside the point." *Regents of the Univ. of Calif. v. Bakke,* 438 U. S. 265, 289 (98 SC 2733, 2747, 57 LE2d 750) (1978). To the extent there exist enough minority contractors to meet the "goals" set by the mayor for city contracts, non-minority and non-female contractors can only compete for the remaining percentage of the available work, rather than for 100 percent of the work. "[W]hether this limitation is described as a quota or a goal, it is a line drawn on the base of race and ethnic status." Id.

As pointed out by Justice O'Connor in *City of Richmond,*

[s]ince the [C]ity must already consider bids and waivers on a case-by-case basis, it is difficult to see the need for a rigid numerical quota. . . [T]he congressional scheme upheld in *Fullilove* allowed for a waiver of the set-aside provision

where an MBE's higher price was not attributable to the effects of past discrimination. Based upon proper findings, such programs are less problematic from an equal protection standpoint because they treat all candidates individually, rather than making the color of an applicant's skin the sole relevant consideration. Unlike the program upheld in *Fullilove*, the [city's] waiver system focuses solely on the availability of MBEs; there is no inquiry into whether or not the particular MBE seeking a racial preference has suffered from the effects of past discrimination by the city or prime contractors.

*City of Richmond*, supra at 4143.

The city failed to identify the need for a race-conscious program in the awarding of its public contracts and the program established by the city is in no way "narrowly tailored" for its asserted needs. Accordingly, Atlanta's MFBE cannot withstand the strict scrutiny analysis we have employed to test its compliance with equal protection under our state constitution.[8]

*Judgment reversed. All the Justices concur.*

DECIDED MARCH 2, 1989.

*Stokes, Shapiro, Fussell & Wedge, J. Ben Shapiro, Jr., Cofer & Beauchamp, Charles V. Choyce, Jr.,* for appellant.

*Marva Jones Brooks, Alford J. Dempsey, Jr.,* for appellees.

*William O. Miller, G. Stephen Parker, Robert B. Baker, Jr., Smith, Currie & Hancock, Philip E. Beck,* amici curiae.

---

[8] The plaintiff challenged the program on two other grounds: (1) the charter amendment conflicts with OCGA § 36-35-6 (a) (2) (c) prohibiting the city from amending the charter to provide for "fines and forfeitures" in excess of $1,000; and (2) the program violates Art. III, Sec. VI, Par. V of the state constitution in that the use of race or sex-based criteria in the award of city contracts acts as an unreasonable diminishment of competition. We do not address those challenges.