The Honorable Jerry Jewell State Senator 721 East 21st Street Little Rock, AR 72206
Dear Senator Jewell:
This is in response to your request for an opinion regarding Senate Bill 318. You have asked for us to advise you as to the bill's legality.
A conclusive response to your question will require a searching review of the factual basis for the legislation. See City ofRichmond v. J.A. Croson Co., 488 U.S. 469 (1989). This type of review is ordinarily not within the province of an Attorney General opinion because this office is not equipped to investigate and evaluate questions of fact in most cases. We will, however, review the current status of the law in this area in order to provide a legal background for the factual determination.
We will first outline the pertinent provisions of Senate Bill 318. Section 2 of the bill states:
 The Arkansas General Assembly finds that small and disadvantaged business owners have suffered a social disadvantage and a resulting economic disadvantage evident by denied access to capital markets and procurement opportunities which have benefitted non-disadvantaged firms. It is the policy of the State of Arkansas to support equal opportunity, as well as economic development in every sector. Therefore, the Arkansas General Assembly recognizes as the purpose of this measure the policy of supporting the fullest possible participation of the firms owned and controlled by small and disadvantaged persons in state funded and directed public construction programs and in projects involving state purchase of goods and services.
The case of City of Richmond v. J.A. Croson Co., supra,
articulates the standards to be applied in assessing the constitutionality of Senate Bill 318. The U.S. Supreme Court inCroson considered the constitutionality of racial and ethnic classifications. Senate Bill 318 establishes a minimum percentage requirement for "small disadvantaged businesses," which are those small businesses, as defined in the federal Small Business Administration size standards, with at least a 51% ownership by one or more minority persons. SB 318, Section 3(11). It may reasonably be concluded that the bill includes classifications based on race, national origin, and gender.[1] Although the definition of "disadvantaged person" includes white males who cannot effectively access capital and procurement opportunities, no such limitation is placed on the other categories of "disadvantaged persons." Accordingly, the classification may be found to be race, ethnic, or gender-based, requiring consideration of cases involving the constitutionality of such classifications. See Milwaukee County Pavers Ass'n v.Fiedler, 710 F.Supp. 1532 (W.D. Wis. 1989).[2]
Please note that I have enclosed a copy of Attorney General Opinion Number 89-023, which discusses at length the U.S. Supreme Court's decision in Croson, supra. As noted in that opinion, the court will apply a strict scrutiny standard of review to any classification based on race, regardless of the stated justification as benign or remedial. See also Wygant v.Jackson Bd. of Education, 476 U.S. 267 (1986). There must, as a threshold matter, be a compelling governmental interest in the use of the race-based quota. Croson, 488 U.S. at 485. While it seems clear that a state has the authority to eradicate the effects of private discrimination within its own jurisdiction, this authority must be exercised within the constraints of Section 1 of the Fourteenth Amendment to the United States Constitution (the "Equal Protection" clause). Id. at 492. Classifications based on race must, according to the court, be "strictly reserved for remedial settings." Id. at 493. The factual basis for the enactment must therefore be examined. Id.
at 495. There must be a "strong basis in evidence" for the conclusion that remedial action is necessary. Id. at 500,citing Wygant, supra. A generalized assertion that there has been past discrimination in the construction industry will not suffice. Id. at 498. The court in Croson stated that a generalized assertion "provides no guidance for a Legislative body to determine the precise scope of the injury it seeks to identify." Ibid.
The court also stated that "societal discrimination" is an "inadequate basis for race-conscious relief," citing to its prior decision in Wygant, supra. Id. at 497, 505. The court rejected an argument that a city council, like Congress, need not make specific findings of discrimination to enage in race-conscious relief. Id. at 489. A political subdivision, or a state, enjoys fewer remedial powers than Congress. While Congress has a specific constitutional mandate to enforce the dictates of the Fourteenth Amendment, (Croson, supra, at 490), Section 1 of that Amendment is an explicit constraint on state power. Thus, the Court concluded, the probative value of Congress' finding that there has been nationwide discrimination in the construction industry is "extremely limited." Id. at 504.
As noted in Opinion Number 89-023, the factual predicate for the minority set-aside plan in Croson failed. The Court concluded that none of the evidence presented by the City pointed to any identified discrimination in the Richmond construction industry. Id. at 507. The Court found that many of the barriers to minority participation in the construction industry were race-neutral, yet there was no evidence of consideration of race-neutral means to solve the problem. Ibid. The race-neutral factors included deficiencies in working capital, inability to meet bonding requirements, unfamiliarity with bidding procedures, and disability caused by an inadequate track record. Id. at 499.
If, according to the Court, the city had evidence before it that minority businesses were "systematically excluded" from contracting opportunities, action to end the discrimination would be proper. Id. at 509. A state entity may, under state-law authority, address discriminatory practices within local commerce under its jurisdiction. Id. at 492. Statistical disparity may form the basis for an inference of discriminatory exclusion; but where special qualifications are necessary, the relevant statistical pool must be the number of minorities qualified to undertake the particular task. Id. at 501, 509. The Court inCroson stated that reliance on the disparity between the number of prime contracts awarded to minority firms and the minority population of the city of Richmond was misplaced. Id. at 501.
The Court in Croson was also concerned by the "random inclusion" of other racial groups in the City of Richmonds's minority set-aside plan. The Court stated: "There is absolutelyno evidence of past discrimination against Spanish-speaking, Oriental, Indian, Eskimo, or Aleut persons in any aspect of the Richmond construction industry." Id. at 506 (emphasis added). This suggested to the Court that "perhaps the city's purpose was not in fact to remedy past discrimination." Id.
There have been instances, however, subsequent to Croson, in which minority business enterprise programs have been upheld. InCone Corp. v. Hillsborough County, 908 F.2d 908 (11th Cir. 1990), the Eleventh Circuit Court of Appeals distinguishedCroson on the facts and upheld a county program that established minority business enterprise participation goals. Prolonged studies of the local construction industry in that case indicated a continuing practice of discrimination, evidenced by a glaring disparity between the number of qualified minority businesses in the industry and geographic area (the county) and the number actually utilized in government contracts. ConeCorp. at 915. The court also looked at the number of qualified minority businesses in the relevant market and the percentage of total county dollars received by minority firms. Id. at 914. The fact that the county had first tried a race-neutral scheme was also found to be persuasive. Id. And the court relied further upon the fact that complaints had been received alleging discrimination in county construction and procurement. Id. at 915.
It is thus apparent that statistical disparities may constitute a prima facie case of discrimination. See also Conclin v.Blanchard, 745 F. Supp. 413 (E.D. Mich. 1990); Rex Paving Corp.v. White, 531 N.Y.S.2d 831, 139 A.D.2d 176 (1988).
The foregoing factors must, in my opinion, be considered in addressing the constitutionality of Senate Bill 318. There must be an identification of discrimination "with some specificity" (Croson, 488 U.S. at 504) before a court will uphold the race-conscious provisions. The inclusion of several different racial and ethnic groups may be problematic, in the absence of evidence of past discrimination against these groups. The one bringing the challenge will, however, ultimately bear the burden of establishing the unconstitutionality of a minority business enterprise program. Rex Paving Corp., supra.
It seems clear that generalized statements of past discrimination will not be deemed sufficient. The Georgia Supreme Court decision in American Subcontractors Association, GeorgiaChapter, Inc. v. City of Atlanta, 259 Ga. 14, 376 S.E. 2d 662
(1989), decided subsequent to the Croson decision, may offer some guidance in this regard. The program in that case provided favored treatment for minority and female-owned business enterprises in the award of city contracts. Applying the strict scrutiny standard, the court looked to: (1) whether the legislation was within the power of the enacting authority; (2) whether there was convincing evidence of prior discrimination; and (3) whether the affirmative action program was sufficiently narrowly tailored to address the effects of past discrimination.376 S.E.2d at 664, citing Croson, supra. The court concluded that the evidence offered by the city was inadequate to justify the program. There was no evidence that qualified minority contractors were passed over for city contracts either as a group or in any individual case. Id. at 665. The court rejected the city's statistical evidence (minority participation in city contracts at .13 percent), stating: "However, as in Cityof Richmond [Croson], this figure is meaningless because there is no data for that period indicating the number of minority contractors capable of performing the work." Ibid. The court also found that the inclusion of other racial and ethnic groups, in the absence of evidence of discrimination against those groups, impugned the city's claim that the program was motivated by remedial purposes. Id. at 666.
According to the court, the program was not "narrowly tailored" to remedy prior discrimination. Id., citingCroson.[3] This conclusion was based upon the "gross over-inclusiveness" of the racial preference, noted above; the absence of any showing that the program was linked to identified discrimination in any way;[4] and the court's finding that the annual "goal" was not narrowly tailored. As to the latter finding, the court pointed to the program's waiver system, which focused solely upon the availability of minority businesses; there was no inquiry into the existence of past discrimination.Id. citing Croson. The Georgia court thus concluded that the city had failed to identify the need for a race-conscious program, and that it could not withstand strict scrutiny analysis. Id. at 667.
It is my opinion that the foregoing cases, and the various factors outlined therein, will form the basis for a judicial review of Senate Bill 318. Some general propositions may be gleaned from the cases in this area. There must, as an initial matter, be a factual predicate for any remedial action by a governmental body. Governmentally-imposed minority preferences are constitutionally permissible, but they may not be based on the desirability per se of achieving racial balance or proportional representation of minorities in selected institutions. Shurberg Broadcasting of Hartford, Inc. v.F.C.C., 876 F.2d 902 (D.C. Cir. 1989).
The courts have recognized that the objective of remedying past discrimination may justify the use of minority preferences. A state or local government must, however, have stronger evidence of discrimination than Congress before it can employ racial classifications. Croson, supra. And that evidence must approach a prima facie case of a constitutional or statutory violation. Id.
The fact-finding process thus appears to be critical to the determination of the bill's constitutionality. A legislative finding of prior discrimination may be sufficient, so long as the program is sufficiently narrowly tailored to the remedial purpose. The Croson case and subsequent decisions indicate, however, that factual support is necessary.
The foregoing opinion, which I hereby approve, was prepared by Deputy Attorney General Elisabeth A. Walker.
Sincerely,
WINSTON BRYANT Attorney General
WB:arb
[1] Although Section 3(11), which defines "small disadvantaged business", references "minority persons," we assume that the preference is for such businesses which are at least 51% owned by one or more disadvantaged persons, as defined in Section 3(8). It is clear under Section 2 that the purpose of the bill is to support participation of small businesses and firms owned and controlled by "disadvantaged persons."
[2] This case involved a state disadvantaged business enterprise program based on federal requirements and definitions of "small business concern" and "small business concern owned and controlled by socially and economically disadvantaged individuals" (Surface Transportation Uniform Relocation Assistance Act of 1987 (15 U.S.C. § 637(d))). The act establishes a presumption that socially and economically disadvantaged individuals include Black Americans, Hispanic Americans, Native Americans, Asian Pacific Americans, and other minorities or any other individuals found to be disadvantaged. The court rejected a contention that this was a disadvantaged business program, and that cases considering the constitutionality of race-based classifications were inapplicable. Id. at 1539, n. 2. The court had previously determined that the operative categories of the statute were race, national origin, and gender, and not disadvantage; thus, the challenged statute provided for aminority business program. Ibid.
[3] The court cited here to the absence of any showing that the city considered alternative remedies, where there was evidence that many of the barriers to minority participation in the construction industry were race-neutral. Two city witnesses acknowledged that problems such as the lack of capital or bonding capability could be ameliorated by alternate remedies.376 S.E.2d at 666. Thus, less-intrusive means, which had not been fully explored by the city, were available. Ibid.
[4] Factors considered by the federal district court inMilwaukee County Pavers Ass'n v. Fiedler, supra, included: (1) whether the degree of preference is tied to the effects of past discrimination; (2) the prior consideration of race-neutral alternatives; and (3) whether the plan imposes an unfair burden on innocent nonminorities. Fiedler at 1549.