## A03A0680. JERRY DICKERSON PRESENTS, INC. v. CONCERT/ SOUTHERN CHASTAIN PROMOTIONS et al.

(579 SE2d 761)

ELDRIDGE, Judge.

This case asks us to examine, inter alia, whether a "joint venture" entered into by two separate businesses for purposes of meeting the City of Atlanta minority business enterprise ("MBE") criteria formed a legal "partnership." Because the facts of record do not demonstrate that a partnership relationship existed between the two businesses, we answer in the negative.

Named-defendants Alex Cooley, Peter Conlon, and Stephen Selig III are partners in the business of promoting music events in various venues in and around Atlanta; they formed several corporations in furtherance thereof, including named-defendants High Cotton, Inc. ("HCI") and Southern Promotions, Inc. ("SPI"). In the late 1980s, HCI and SPI created a Georgia joint venture, named-defendant Concert/ Southern Chastain Promotions ("C/S"), for the purposes of promoting and presenting live performance concerts at Chastain Park Amphitheater ("Chastain") owned by the City of Atlanta (the "City"). Jerry Dickerson Presents, Inc. ("Dickerson"), a minority-owned concert promotion business, was not a party in C/S.

On December 21, 1990, C/S and named-defendant Robert W. Woodruff Arts Center d/b/a named-defendant Atlanta Symphony Orchestra (the "Symphony") formed Chastain Ventures ("Ventures") through a "Joint Venture Agreement" (the "Agreement") for the "limited purposes of entering into a contractual arrangement with the City of Atlanta . . . for a lease . . . of the facilities at Chastain, subleasing the use of Chastain on certain dates . . . to promoters." In the Agreement, the Symphony and C/S contracted to share all liabilities and profits. The Agreement also states that the Symphony and C/S,

> agree that they will use their best efforts to ensure that the Joint Venture complies with the requirements of Article M, Minority and Female Business Enterprises . . . or any other minority business participation program which may subsequently be adopted by the City of Atlanta and the goals set forth in the Lease, with respect to the production and promotion of Event Dates by minority business enterprises.

In furtherance thereof, the Agreement states that,

> [r]ental payments for the use of Event Dates . . . that are subsequently contracted with respect to by [C/S] and a minority business enterprise . . . shall be the same as charged to [the Symphony and C/S].

Dickerson was not a party to the Agreement.

That same day, December 21, 1990, Ventures entered into a ten-year lease (the "Lease") with the City, running from January 1, 1991, through December 21, 2000, and including an option to renew. By the terms of the Lease, Ventures agreed to,

> endeavor to sublease thirty-five percent (35%) of the available event-dates . . . to qualified minority business enterprise promoters. The City will identify those qualified minority business enterprises with which Ventures will endeavor to meet these goals.[1]

Dickerson was not a party to the Lease or mentioned therein.

Several days later, on January 18, 1991, Ventures and Dickerson entered into an "Agreement to Sublease" (the "Sublease") in order to facilitate the goal to sublease 35 percent of the available Chastain event dates to minority-owned businesses. The Sublease specifically stated that its initial term was to commence on February 1, 1991, and end five years later, with the option for one five-year extension. The terms of the Sublease permitted Dickerson to sublet from C/S 13 event dates at Chastain ("Dickerson Dates"). The Sublease states,

> The purpose of this Agreement shall be to provide the basic terms and conditions upon which Dickerson will sublease the Dickerson Dates and Dickerson will promote and produce events on the Dickerson Dates, at Chastain, in compliance with the intent of . . . the provisions of the Lease regarding minority participation.

The Sublease also provides that Dickerson could enter into an arrangement to "co-promote" the Dickerson Dates with C/S, thereby creating "Dickerson-C/S Association Dates" ("Association Dates"). In the event of such co-promotion arrangement, Dickerson would pay no rental fee for the Dickerson Dates but would, instead, receive payment for the sublease of the Dickerson Dates to C/S. Also, in the event of such co-promotion arrangement, Dickerson would have no liability for debts and expenses; while, in the absence of such arrangement, "[a]ll liabilities, debts, expenses, losses, and payments incurred in connection with promoting and producing of events on each of the Dickerson Dates . . . shall be the responsibility of Dicker-

---

[1] In March 1989, the Supreme Court of Georgia held that the City's then MBE ordinance was unconstitutional. *American Subcontractors Assn. v. City of Atlanta*, 259 Ga. 14 (376 SE2d 662) (1989). Apparently, at the time Ventures and the City entered into the Lease, no MBE ordinance was in effect, and Ventures voluntarily undertook to meet prior MBE goals in order to secure the Lease with the City.

son." Thereafter, the terms of the Sublease created an "exclusivity" clause wherein Dickerson agreed that,

> it will not contract with any promoter other than [C/S] . . . . and Ventures agrees that it will not contract with any other minority business enterprise regarding the promotion and production of events held on the Dickerson Dates.

The Sublease also contained a nontransfer provision wherein,

> Neither Ventures nor Dickerson shall have the right to assign, convey, exchange, sell . . . or otherwise transfer in any way all or any part of its interest in this [Sublease] without the prior written consent of the other party. Any purported transfer of an interest in this [Sublease] shall be null and void and have no effect whatsoever.

Additionally, the Sublease stated that, "No joint venture is to be created or implied by the existence of this Agreement." The Sublease is the only contract between Ventures and Dickerson and "constitutes the entire agreement of the parties."

Reflecting the Sublease's exclusive co-promotion arrangement with C/S, Dickerson and C/S contemporaneously executed a "Promotion and Consulting Agreement" ("PC Agreement"). The PC Agreement was to run for the term of the Sublease. Pursuant to the PC Agreement, C/S was allowed to sublet the Dickerson Dates from Dickerson in exchange for 35 percent of the net profits received from such dates — but only up to an annual aggregate of $70,000. In the PC Agreement, Dickerson was to assist C/S in the co-promotion and production of concerts and other events held on the Association Dates; however, the terms of the PC Agreement were clear that,

> [C/S] shall be the managing promoter of all of the events held on the Concert/Southern-Dickerson Association Dates, and all promotion and production activities carried on by Dickerson shall be at the direction, and subject to the prior written approval of Concert/Southern.

In addition, under the terms of the PC Agreement: (a) C/S was entitled to all of the revenues generated from the Dickerson Dates, excluding the $70,000 fee therefor; (b) all expenses, losses, and debts incurred through promotion and production of the Association Dates were the responsibility of C/S to be subtracted from revenues; and (c) neither party was to be liable for the indebtedness or obligations of the other. The PC Agreement also stated that, "No joint venture is to be created or implied by the existence of this Agreement" and that

such PC Agreement "constitutes the entire agreement of the parties with respect to the subject matter hereof." The PC Agreement is the only contract between C/S and Dickerson.

Thereafter, from 1991 on, pursuant to the Sublease, Ventures made 35 percent of the Chastain event dates available to Dickerson. And each year, C/S exercised its option under the PC Agreement to obtain the dates from Dickerson. Dickerson put up no funds for any concerts performed at Chastain and signed no contracts with any artists that performed there; nor did he purchase advertising, pursue sponsorship, or engage in similar promotional activities with regard to Chastain.

Compliance with the City's MBE ordinance is monitored by the City's "Office of Contract Compliance" (the "OCC"). Over the years of the Lease, Dickerson aided in Ventures' demonstration of compliance with the MBE ordinance by engaging in communications with the OCC. In one letter from the OCC to Dickerson, a representative referenced an OCC meeting between Dickerson and "one of your joint venture partners." In a 1991 letter to the OCC, Dickerson referred to himself as "the minority joint venture partner" and asserted that "my company and I have a fine and rewarding relationship with . . . Ventures. . . . I have participated in all aspects of such concert promotions including the booking of talent, marketing, production and administrative functions."

In addition, in 1992, at the request of the City, Dickerson submitted a pre-printed "Joint Venture Affidavit" form (the "Affidavit") to demonstrate compliance with MBE goals, which Affidavit styled a nonminority business's contractual agreement with a minority business as a "Joint Venture." In one portion of the Affidavit, affiant Dickerson referred to Ventures and Dickerson as "joint venture partners" and also represented that "[Dickerson] shares profits or losses on a 65-35 basis" with Ventures. The Affidavit was signed by Dickerson, but not by Ventures.

In March 1998, Cooley, Conlon, and Selig sold 100 percent of their individually held stocks in their promotion businesses, inclusive of HCI and SPI,[2] to named-defendant SFX Entertainment, Inc. ("SFX") for approximately $16 million. The sale encompassed HCI and SPI's joint venture interest in C/S and, as a consequence, C/S's joint venture interest with the Symphony in Ventures.[3] SFX created

---

[2] HCI, SPI, Buckhead Promotions, Inc., Northern Exposure, Inc., Pure Cotton, Inc., Cooley and Conlon Managements, Inc., and Interfest, Inc.

[3] Pursuant to a specific provision in the Joint Venture Agreement between C/S and the Symphony which created Ventures, written consent of the Symphony had to be obtained in order for HCI or SPI to transfer or otherwise dispose of any portion of its interest in Ventures and/or for Cooley, Conlon, and Selig to transfer more than 50 percent of the stock of HCI or SPI to a third party. Such provision was not included in any contractual agreement with Dickerson.

a subsidiary, named-defendant Atlanta Concerts, Inc. ("Atlanta Concerts"), through which to take title of such interests, and Cooley was retained as Co-President thereof. Following the transfer of ownership of HCI and SPI to Atlanta Concerts, C/S and Ventures continued to honor their contractual agreements with Dickerson.

On March 5, 1999, Dickerson through his lawyers made a demand for $2.625 million as his 35 percent share of the presumed $7.5 million value of the sale of Cooley, Conlon, and Selig's Chastain interests, i.e., C/S and Ventures. His contention was that a joint venture "partnership" had been created between Cooley, Conlon, Selig, C/S, Ventures, and Dickerson by virtue of the City's MBE ordinance requirements as discussed in Dickerson's communications with the OCC and as reflected in the Agreement between the Symphony and C/S creating Ventures; the Lease between Ventures and the City; the Sublease between Ventures and Dickerson; and the PC Agreement between C/S and Dickerson. Dickerson's assertion was that, "My joint venture partnership emanates from a City ordinance that requires 35 percent minority participation." Dickerson maintained that Cooley, Conlon, and Selig's sale of their Chastain interests effectively dissolved the partnership with Dickerson without making any distribution of the profits to Dickerson, since the partnership's only asset was the right to promote concerts under the Lease. Dickerson's monetary demand was rejected, and a series of communications threatening litigation began.

Meanwhile, in 1998, 1999, and 2000, Ventures continued to adhere to the terms of the Sublease, making 35 percent of the Chastain event dates available to Dickerson. In each of these years, C/S exercised its option under the PC Agreement to obtain the Dickerson Dates from Dickerson, paying him the maximum amount therefor. Dickerson accepted such payments, and the record contains copies of the checks deposited by Dickerson. Evidence of record reveals no change in the contractual relationship between C/S, Ventures, and Dickerson.

In 1999, Ventures began negotiations with the City for a new ten-year lease of Chastain. In numerous communications dated between December 1999 and May 2000, C/S and Dickerson attempted to come to terms with regard to Dickerson's future participation in the sublease of event dates and co-promotion of events at Chastain following the expiration of the Lease. The record contains separate "Draft Agreements" exchanged during the course of these negotiations which show that the parties were far from reaching an accord as to Dickerson's future percentage of net profits for the sublease to C/S of the Dickerson Dates: C/S's draft proposed paying Dickerson 35 percent of net profits from concerts produced by C/S on the Dickerson Dates, with a minimum payment of no less than $110,000

per year; in his draft, Dickerson wanted 100 percent of the net profits generated by concerts produced by C/S on the Dickerson Dates. In addition, defendants' draft proposed specific new co-promotion duties for Dickerson under a "Participation Management Agreement," while Dickerson's draft never specified any co-promotion duties.

In December 2000, the City agreed to renew the Lease with Ventures ("Renewal Agreement"), to be effective January 1, 2001 (the "2001 Lease"). Thereafter, because of what it perceived as unreasonable monetary demands and unnecessary threats of litigation by Dickerson, C/S and Ventures decided to seek an arrangement with a different minority-owned business in order to comply with the City's MBE ordinance.

Dickerson filed the instant suit against the named-defendants identified above ("defendants"), claiming trespass/taking of property, breach of contract as to the Sublease, breach of contract as to the PC Agreement, and breach of fiduciary duty, because ownership of C/S and its interest in the PC Agreement and Ventures' Sublease were transferred to SFX (a) without Dickerson's permission as required by the nontransfer provision in the Sublease, and (b) in violation of C/S and Ventures' joint venture "partnership" with Dickerson to promote and produce concert events at Chastain. Dickerson also claimed breach of a contractual expectation that he would participate in the 2001 Lease. In addition, Dickerson alleged a claim of tortious interference with contract and a claim of "aiding and abetting breach of fiduciary duty" against SFX.

Defendants answered, asserting that: (a) there was no legal "partnership" between the named-defendants and Dickerson so as to create any right in Dickerson that would be affected by the transfer of Cooley, Conlon, and Selig's individual interests in HCI and SPI; (b) the nontransfer provision of the Sublease was not violated by Cooley, Conlon, and Selig's transfer of their individual stock interests in HCI and SPI to a third party; (c) all of the parties' obligations under the Sublease and the PC Agreement had been completely met so there was no breach of contract thereunder; and (d) there was no meeting of the minds so as to create a contractual expectation that Dickerson would participate in the 2001 Lease.

Defendants filed a motion for summary judgment. Dickerson filed a cross-motion for summary judgment. A hearing was held thereon July 3, 2002. After hearing the arguments of the parties, the trial court took the matter under advisement. Thereafter, without stating a factual or legal basis, the trial court granted defendants' motion for summary judgment and denied Dickerson's summary judgment motion. In addition, in the same order and in the same fashion, the trial court denied an earlier motion filed by Dickerson seeking to add the City and Bill Campbell, the City's former mayor,

as defendants "for purposes of challenging the Renewal Lease between the City and Chastain Ventures." Dickerson appeals from that order. *Held*:

To obtain summary judgment, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the nonmoving party, warrant judgment as a matter of law.[4] On appeal, this Court applies a de novo standard of review and must draw all inferences in favor of the nonmoving party.[5] If, however,

> there is no evidence sufficient to create a genuine issue as to any essential element of plaintiff's claim, that claim tumbles like a house of cards. All of the other disputes of fact are rendered immaterial.[6]

1. Dickerson first claims error in the trial court's grant of summary judgment to the defendants because "material facts of record show the existence of a partnership between the parties and a breach thereof by defendants." In demonstrating material facts of record which show a partnership relationship, Dickerson sifts through over seven thousand pages of transcript and, by brief, directs our attention to three letters referring to Dickerson as a "joint venture partner" or a "minority partner," one of which was written by Dickerson and none of which were written by defendants. In addition, Dickerson claims that because the pre-printed MBE Affidavit is styled "Joint Venture Affidavit," a partnership relationship was created. Dickerson also points to the MBE Affidavit and claims that such document "identifies the name of the partnership as 'Chastain Ventures/ Jerry Dickerson Presents, Inc.'" and that the Affidavit states "the Joint Venture *Partners* share in profits or losses on a 65-35 basis," and that "the Joint Venture *Partners* collaborate on details of concerts." Finally, Dickerson identifies two letters, one of which was written by himself, that he claims demonstrates the "interrelatedness of the partnership arising from the 1990 Chastain Lease, the Sublease, and the Promotion Agreement," because, read together, these documents acknowledge the MBE requirements of the City, the need to meet such requirements, and Dickerson's status as a qualified MBE in fulfillment of such requirements.

Contrary to Dickerson's contentions, the use of the label, "joint

---

[4] OCGA § 9-11-56; *Lau's Corp. v. Haskins*, 261 Ga. 491 (405 SE2d 474) (1991).

[5] *Youngblood v. Gwinnett Rockdale &c. Svc. Bd.*, 273 Ga. 715, 717-718 (4) (545 SE2d 875) (2001).

[6] (Citations and punctuation omitted.) *Pakwood Indus. v. John Galt Assoc.*, 219 Ga. App. 527, 529 (1) (466 SE2d 226) (1995).

venture partner" or "minority partner" in the cited letters and MBE Affidavit does not by itself demonstrate the existence of a legal "partnership" and all the rights and obligations engendered thereby.[7] Nomenclature is not dispositive, and we must "look[ ] at other documents to see whether a partnership had in fact been created."[8] Whether a partner in a joint venture is a party to a legal "partnership" is a question of fact "and depends on the rights and responsibilities assumed by the joint venturers,"[9] i.e., "a sharing of the fruits and losses with an equal right, expressed or implied, to direct and control the conduct of the enterprise."[10] A seminal case in 1981 recognized the type of situation in which a joint venture might indeed be a partnership:

> If the two parties purchased the cotton jointly, paid equal portions of the purchase money, were to pay equal portions of the expenses and transportation of the cotton, and were to share in the losses and profits, it is a copartnership. There is no difference between a joint adventure, *when the joint adventurers purchase jointly, and are to participate in the losses and profits,* and a copartnership. Such an adventure is a copartnership. [Cit.] . . . It has often been declared that a partnership is created inter se only where the parties so intend. But, broadly stated, this expression may be misleading. The intent which is controlling *is the intent to contract for those things which the law declares constitute a partnership*. If the parties intend to enter into such a contract and actually do so, they will be partners although they may have intended to avoid this consequence or may even have expressly stipulated that they are not to be partners.[11]

So, the questions are, what does the law declare constitutes a "partnership," and does the relationship between Dickerson, C/S, and Ventures, — irrespective of the labels applied thereto — demonstrate partnership.

> Factors that indicate the existence of a partnership include a common enterprise, the sharing of risk, the sharing of expenses, the sharing of profits and losses, a joint right of control over the business, and a joint ownership of capital.[12]

---

[7] See OCGA § 14-8-1 et seq.

[8] *Accolades Apts. v. Fulton County*, 274 Ga. 28, 29 (549 SE2d 348) (2001).

[9] Id. at 30; *Kissun v. Humana, Inc.*, 267 Ga. 419, 420 (479 SE2d 751) (1997).

[10] *Boatman v. George Hyman Constr. Co.*, 157 Ga. App. 120, 123 (276 SE2d 272) (1981).

[11] (Citations and punctuation omitted; emphasis supplied.) Id.

[12] (Footnote omitted.) *Aaron Rents, Inc. v. Fourteenth Street Venture*, 243 Ga. App. 746, 747 (1) (533 SE2d 759) (2000).

In this case, Dickerson's only rights in relation to Ventures are those outlined in the only contract between the parties, the Sublease. The Sublease gives Dickerson, as an independent minority promoter, the right to lease 35 percent of the non-Symphony Chastain event dates at the same rental rate Ventures would charge to any other third-party lessee. Under the terms of the Sublease, Ventures does not share with Dickerson in the profits or the losses connected with Dickerson's use of the Dickerson Dates, nor does Ventures share in Dickerson's liability if he chooses to utilize the Dickerson Dates. Certainly nothing in the Sublease gives Dickerson control over the conduct of Ventures. The Sublease does not in any fashion reflect an intent between Ventures and Dickerson to form a mutual legal "entity." To that end, such document does not show a joint venture, let alone a partnership.[13]

The same holds true for the PC Agreement, which is the only contract between C/S and Dickerson. The PC Agreement provides that, if C/S exercised the option to sublease the Dickerson Dates from Dickerson, it did so with complete responsibility for all loss incurred in relation to producing and promoting the events on such dates. A maximum amount of $70,000 was to go to Dickerson as payment for the sublease of the Dickerson Dates, regardless of C/S's total net profits in relation thereto. Even Dickerson's "assistance" in promoting the events held on the dates C/S sublet from Dickerson appears titular only, since under the terms of the PC Agreement, C/S was the managing promoter of all of the events held on the Association Dates, and all promotion and production activities carried on by Dickerson "shall be at the direction" of C/S, and subject to C/S's prior written approval. This is hardly the "equal right" to direct and control the promotion of the event dates reflective of a partnership or a joint venture.

Moreover, and contrary to Dickerson's representations, the preprinted portions of the MBE "Joint Venture Affidavit" submitted to the City by Dickerson never refer to a joint venture as a "partnership" or to the joint venturers as "partners." That language, twice appearing in the Affidavit, came solely from those portions filled out by affiant Dickerson and does not reflect the legal relationship between the parties as established by their contractual agreements.[14]

---

[13] *Accolades Apts. v. Fulton County,* supra at 29-30 (a joint venture is a "combin[ation of] property or labor, or both, in a joint undertaking for profit, with rights of mutual control (provided the arrangement does not establish a partnership), so as to render all joint venturers liable for the negligence of the other").

[14] Notably, this case does not involve a third party making an estoppel argument based upon a false representation of partnership by another. See OCGA § 14-8-16. In this case, Dickerson was well aware of the parameters of his contractual relationships with C/S and Ventures and cannot rely upon his own misrepresentations to the City or others concerning such relationships in order to establish "partnership."

Nor was partnership status even necessary to meet the MBE ordinance. From the language of the pre-printed "Joint Venture Affidavit," which appears carefully crafted, the City clearly did not contemplate that a "joint venture" entered into for purposes of complying with the MBE requirements would bind the parties thereto in a legal "partnership," absent the desire of the parties to do so as reflected by their separate contractual arrangements. In that regard, Dickerson's status as qualifying under the City's MBE criteria, while perhaps an important reason for Ventures' decision to lease the event dates to him, does not by the terms of the Sublease create any more rights in Dickerson than those afforded any other minority (or nonminority for that matter) third-party lessee. Likewise, Dickerson's function of fulfilling the City's MBE requirements as reflected in the PC Agreement does not in itself confer upon him "partnership" status when no portion of the PC Agreement reflects the rights and responsibilities of partnership. So, in contradiction to the essence of Dickerson's contentions, we find that the City's MBE goals, laudable as they are, cannot by themselves be bootstrapped into a legal "partnership" between the minority enterprise obtaining the benefit of those important goals and the nonminority enterprise rightfully seeking to comply with those goals.[15]

Relevantly, the record before us contains a letter from Dickerson to the defendants dated April 27, 2000, wherein he specifically stated, "There is no partnership in existence between [Dickerson] pertaining to Chastain or any of its operations." We agree with that assessment of Dickerson's status and reject his current assertions to the contrary. Accordingly, the trial court did not err in granting defendants' motion for summary judgment on Dickerson's claims premised on the existence of a "partnership" relationship.

2. Next, Dickerson contends that "material facts of record show a breach of fiduciary duty, constructive fraud and breach of contract . . . for fail[ing] to accurately disclose the terms of the SFX transaction sufficient for [Dickerson] to determine whether there had been a transfer in violation of the Sublease." We find this contention meritless.

---

[15] As discussed above, "joint venture" is a legal term of art which encompasses notions of mutual control, as well as joint liability and joint participation in profit and loss. Since, many of the City's MBE goals are met through sublease and subcontract – which may or may not entail mutual control, joint liability, and participation in profit or loss with regard to the entire contracted job – the City's use of an affidavit styled a "Joint Venture Affidavit" and its references to the minority/nonminority cooperative created to meet MBE goals as a "joint venture" should perhaps be rethought in order to allow the parties to such affidavit the fluidity to establish therein the nature of their contractual relationship absent the framework of "joint venture" and the legal ramifications thereof.

(a) Dickerson's claims of breach of fiduciary duty and constructive fraud are based on his claim that a partnership relationship existed: "The nature of the parties' legal relationship is at the heart of Plaintiffs' claims of breach of duty and constructive fraud. If a partnership existed, then the parties had a fiduciary obligation to each other, which Defendants breached." Our decision in Division 1, supra, renders the instant claims of error meritless.

(b) No fiduciary relationship was created by virtue of the following words contained in the Sublease: "this Agreement is based upon the confidence of the parties hereto in each other." "The mere fact that one reposes trust and confidence in another does not create a confidential relationship. A confidential and fiduciary relationship must be shown by proof, and the burden is upon the party asserting the existence of such relationship to affirmatively show the same."[16] No such showing has been made herein.

(c) Dickerson also contends that the "SFX sale" breached the Sublease with Ventures because it violated the nontransfer provision contained therein. We disagree.

Generally, a "joint venture" is not a legal entity separate from those parties that compose it.[17] A corporation, on the other hand, is a legal entity wholly distinct from its stockholders.

> A corporation is an artificial person created by law. The corporate identity is entirely separate from the identity of its officers and stockholders. A corporation and even its sole owner are two separate and distinct persons. One person may own all the stock of a corporation, and still such individual shareholder and the corporation would, in law, be two separate and distinct persons.[18]

Thus, a shareholder's sale of corporate stock, even 100 percent thereof, does not affect the viability and separate nature of the corporate entity, which exists independently of its shareholders.

Here, the so-called "SFX sale" was between individual stockholders Cooley, Conlon, and Selig and corporation SFX. It consisted of a transfer to SFX of 100 percent of those individuals' stock in, inter alia, HCI and SPI. This sale of the defendants' corporate stock may have affected the shareholder control of corporate entities HCI and SPI, but it did not affect HCI and SPI's ownership interest in joint

---

[16] (Punctuation and footnote omitted.) *Bogle v. Bragg*, 248 Ga. App. 632, 637-638 (1) (548 SE2d 396) (2001).

[17] See *Boatman v. George Hyman Constr. Co.*, supra at 123; *Accolades Apts. v. Fulton County*, supra at 29.

[18] (Citations and punctuation omitted.) *Shelby Ins. Co. v. Ford*, 265 Ga. 232, 233 (454 SE2d 464) (1995).

venture C/S and, in turn, C/S's one-half ownership interest in joint venture, Ventures. Accordingly, no transfer or assignment of the Sublease was made by HCI and SPI to a "third party" by virtue of the transfer of Cooley, Conlon, and Selig's stock interest in those corporations to SFX. Dickerson's Sublease was still with Ventures, which was still controlled by C/S, which was still controlled by corporations HCI and SPI, regardless of the identity of HCI and SPI's corporate shareholders.

(d) Dickerson's claim that the SFX sale should have been disclosed to him and his permission obtained therefor as part of the defendants' fiduciary duty under their partnership relationship has been decided adversely to him in Divisions 1 and 2 (a), supra.[19]

(e) Under this same claim of error, Dickerson also alleges that Ventures breached the terms of the Sublease's "exclusivity" clause and its partnership fiduciary duty thereunder when, before the Sublease expired on February 1, 2001, Ventures negotiated with a new minority business enterprise for the term of the 2001 Lease. By brief, Dickerson asserts that "[t]hese facts formed, in part, the basis of Plaintiff's motion to add the City and Mayor Campbell as parties for purposes of injunctive and declaratory relief, challenging the validity of the Renewal Agreement."

(i) Dickerson's claim that negotiations with another minority business enterprise for the 2001 Lease breached defendants' fiduciary partnership obligation to Dickerson has been decided adversely to him in Divisions 1 and 2 (a), supra.

(ii) In the "exclusivity" clause of the Sublease, Ventures agreed that it would not "contract with any other minority business enterprise, regarding the promotion and production of events held on the Dickerson Dates," not that it would refrain from entering into negotiations with another minority business to sublease and co-promote dates other than the Dickerson Dates. Here, the evidence is undisputed that Dickerson was the sole MBE for the promotion and production of events held on the Dickerson Dates, as stated in the Sublease's "exclusivity" clause. There was no breach.

For all of the reasons stated above, the trial court did not err in granting summary judgment to defendants on Dickerson's claims of breach of fiduciary duty, constructive fraud, and breach of contract premised both on Cooley, Conlon, and Selig's sale of their individual stock to SFX and on C/S's negotiations with a new minority business enterprise for purposes of the 2001 Lease of Chastain.

3. Dickerson next contends that "material facts in the record show that defendants trespassed upon plaintiffs' property [by] . . .

---

[19] See also note 3, supra.

wrongly interfer[ing] with plaintiffs' existing contract rights and contract expectations in a renewal of the Sublease." This claim is meritless.

(a) The record is very clear and uncontradicted that Dickerson was offered and accepted the remuneration due him under the existing terms of the Sublease and the PC Agreement; Dickerson admitted such by deposition and the record contains copies of the deposited checks. We cannot discern any specific contract rights granted to Dickerson under the terms of either the Sublease or the PC Agreement with which defendants "interfered" or which were "taken" from him so as to support a claim of trespass or tortious interference with existing contract rights. And, absent his "partnership" argument that we have found meritless for the reason stated in Division 1, supra, Dickerson points to none.

(b) The express language of the PC Agreement and the Sublease does not contain any expectation that Dickerson's rights under such existing documents would extend past the terms contained therein; the PC Agreement stated that its duration was for the term of the Sublease, and the Sublease specifically stated that its initial term was to commence on February 1, 1991, and end five years later, with the right to one five-year extension. Further, Dickerson's attempts to negotiate a new ten-year sublease and promotional agreement in 1999-2000 negate any "expectation" that the original, 1990 Sublease and PC Agreement would extend past the express terms contained therein.

(c) Dickerson also claims that he had a "contract expectation" that he would be the MBE under the 2001 Lease of the facilities at Chastain. We disagree.

A meeting of the minds is the first requirement of law relative to contracts. If there is any essential term upon which agreement is lacking, no meeting of the minds of the parties exists, and a valid and binding contract has not been formed. Acceptance of an offer must be unconditional, unequivocal, and without variance of any sort; otherwise, there can be no meeting of the minds and mutual assent necessary to contract formation.[20]

Without question, the communications between Dickerson and C/S demonstrate that, before negotiations broke down completely, the two parties never came close to agreement on such essential terms as the annual percentage of net profits Dickerson was to be

---

[20] (Citations and punctuation omitted.) *Auto-Owners Ins. Co. v. Crawford*, 240 Ga. App. 748, 750 (1) (525 SE2d 118) (1999).

paid for C/S's use of the Dickerson Dates under the 2001 Lease or Dickerson's promotional duties thereunder. It is clear in this case that the minds of the parties did not meet "at the same time, upon the same subject matter, and in the same sense."[21] The facts of record show that no agreement existed between the parties as to Dickerson's status as the MBE under the 2001 Lease.

For the reasons stated above, the trial court did not err in granting summary judgment to defendants on Dickerson's enumerated claims of trespass and tortious interference with contract premised upon either existing contract rights under the Sublease and the PC Agreement or upon a "contract expectation" that Dickerson would be the MBE under the 2001 Lease of the facilities at Chastain.

4. Next, Dickerson claims the trial court erred in denying his motion to add the City and Bill Campbell as defendants for purposes of challenging the 2001 Lease. In support of this contention, Dickerson merely states the trial court erred and points to no facts of record in support of adding these parties. Moreover, the sole ground for such additions contained in Division 2 (e) is completely meritless. The burden is on the party alleging error to show it affirmatively by the record, and when that burden is not met, the judgment complained of is assumed to be correct and must be affirmed.[22] Accordingly, we find no error in denying Dickerson's motion to add the City and Campbell as defendants to this action.

5. Dickerson contends the trial court erred in granting summary judgment to defendants on their affirmative defenses of accord and satisfaction, estoppel, and waiver. However, absent any finding of fact or conclusion of law from which to determine on what basis the trial court granted summary judgment to defendants, this claim of error is grounded in speculation. Notwithstanding, we find that our decisions in Divisions 1 through 3, supra, reflecting Dickerson's failure to provide this Court with specific facts showing that there is a genuine issue for trial as to any of the substantive claims of his complaint makes summary judgment appropriate as a matter of law. Thus, it is unnecessary for us to address the instant claim of error grounded in the affirmative defenses of the defendants.

6. Based on our decisions in Divisions 1 through 3, supra, we find no error in the trial court's denial of Dickerson's cross-motion for summary judgment on his breach of contract and trespass claims.

*Judgment affirmed. Johnson, P. J., and Mikell, J., concur.*

---

[21] (Citation and punctuation omitted.) Id.
[22] *Magnolia Court Apts. v. City of Atlanta*, 249 Ga. App. 6, 8 (545 SE2d 643) (2001).

330

DECIDED MARCH 14, 2003.

Bauer & Deitch, Henry R. Bauer, Jr., for appellant.

Bondurant, Mixson & Elmore, Emmet J. Bondurant, Kilpatrick Stockton, Susan A. Cahoon, Michael W. Tyler, Smith, Gambrell & Russell, E. Kendrick Smith, Samira Jones, Jones, Day, Reavis & Pogue, Diane P. Flannery, Dean A. Calloway, Kendric E. Smith, for appellees.