A09A0990, A09A0991. BDI LAGUNA HOLDINGS, INC.
v. MARSH; and vice versa.
(689 SE2d 39)

Doyle, Judge.

These consolidated appeals arise from a dispute over employee compensation. In Case No. A09A0990, BDI Laguna Holdings, Inc. ("BDIL") appeals from a jury verdict in favor of Charles Marsh, a former company employee, awarding him the value of certain company stock promised to him. Specifically, the company contends that the trial court erred in entering the judgment because there was inadequate consideration supporting the promise of stock. We agree and reverse.

In Case No. A09A0991, Marsh cross-appeals, enumerating as error (1) the grant of summary judgment to BDIL on Marsh's claims for breach of trust, conversion, and tortious deprivation; (2) the grant of BDIL's motion for judgment notwithstanding the verdict ("j.n.o.v.") as to a portion of the verdict; and (3) the grant of a directed verdict to the former chief executive officer of BDIL. For the reasons stated below, we affirm in that case.

*Case No. A09A0990*

1. "[A]fter rendition of a verdict, all the evidence and every presumption and inference arising therefrom, must be construed most favorably towards upholding the verdict."[1] So viewed, the evidence shows that Marsh was an executive at a consumer electronics retailer, and in 1997, Jay Wertheimer, the majority shareholder and chief executive officer of BDI Distributors, Inc. ("BDI Distributors"), approached Marsh to employ him as an officer at BDI Distributors and to help grow the company in order to attract a potential buyer. Marsh began working for BDI Distributors, and in

---

[1] (Punctuation omitted.) *Williamson v. Strickland & Smith, Inc.*, 263 Ga. App. 431 (587 SE2d 876) (2003).

March 1999, Marsh executed an employment agreement which provided for a renewable five-year term of employment in exchange for certain stated compensation. In addition to the stated compensation, the agreement provided that BDI Distributors, "in the sole and absolute discretion of the Chief Executive Officer [Wertheimer], may pay additional incentive compensation or bonuses to" Marsh.

By January 2000, BDI Distributors had identified an investor group that was making arrangements to purchase a stake in the company. Under the terms of the transaction, BDI Distributors would acquire a smaller company called Laguna Corporation, and the investor group would purchase 20 percent of the combined company for $20 million. The new investors wanted management employees to own stock in the new company to ensure continuity. Marsh and Wertheimer discussed this arrangement, and it was orally proposed that Marsh would be entitled to two percent of the stock of the new company.

In June 2000, BDI Distributors' shareholders executed an agreement requiring each to contribute sufficient shares to make a stock distribution to management employees. It contained a vesting schedule whereby half of the stock distribution would vest to the employee if the employee was employed two years after the date of the agreement, with the second half vesting if the employee was employed four years after the agreement date. BDI Distributors then merged with Laguna and became BDIL. BDIL transferred all of its operating assets to BDI Laguna, Inc., a new wholly owned subsidiary of BDIL.

On June 16, 2000, Wertheimer issued a letter to Marsh notifying him that the merger was complete and that the shareholders had "agreed to make you the owner of the percentage of the stock of the Company as set forth below (subject to a vesting schedule)." The letter contained no vesting schedule but listed Marsh's percentage as two percent. The letter further stated that the company was "reviewing alternative methods to implement your stock ownership."

In December 2001, a restructuring agreement was executed along with an amended shareholders agreement, reorganizing the ownership of the company and eventually making Peter Castenfelt, an outside investor, the chief executive officer and chairman of the board. The agreement characterized the employee stock incentive as "stock or stock option ownership." By 2002, Castenfelt decided to offer stock options — rather than stock itself — to Marsh and the other management employees. Castenfelt then offered the stock options to Marsh at a price of $400,000, which Marsh declined.

The first (two-year) vesting period passed in 2002 without Marsh receiving stock, and Marsh ultimately resigned at the end of 2003, which reflected the end of his five-year term of employment

under his 1999 employment agreement. Marsh filed suit against Wertheimer and BDIL seeking damages for breach of contract and other claims based on the failure to transfer the allegedly promised company stock. Following discovery, and after the denial of the defendants' motion for summary judgment as to the breach of contract claim, a jury trial was held in which the jury found BDIL liable for breach of contract and awarded Marsh $2,208,724, which amount reflected testimony and argument that Marsh was entitled to 2,000 shares of stock valued at $788.83 per share, and which included a "gross-up" award of $631,064 based on an alleged promise by BDIL to pay taxes associated with the transfer of stock. The trial court awarded a stipulated amount of $400,000 in attorney fees pursuant to OCGA § 13-6-11, based on the jury's finding of bad faith on the part of BDIL.

BDIL moved for a new trial and j.n.o.v., which motion the trial court partially granted as to the $631,064 "gross-up," reducing the final award to $1,577,660 (the value of the stock alone) plus $400,000 in attorney fees. BDIL appeals from that order.

BDIL contends that it was entitled to a directed verdict because the promise of stock, as opposed to stock options, was unenforceable due to a lack of consideration. Because Marsh was already obligated under his employment contract to perform duties allegedly supporting the promise of stock, we agree.

Marsh traces the promise of stock to the June 16, 2000 letter from Wertheimer stating that the shareholders had agreed to make him the owner of two percent of the stock of the company. According to Marsh, this letter manifested a promise to pay him stock pursuant to the following provision of his 1999 employment agreement: "In addition to the foregoing compensation [i.e., salary and bonus formulas], the Company, in the sole and absolute discretion of the Chief Executive Officer, may pay additional incentive compensation or bonuses to Employee." Based on this language, Marsh argues that the June 16 letter created an enforceable promise to pay him additional compensation in the form of stock.

However,

> [w]here one undertakes to perform for another service or labor for a given sum, any amount paid in excess of that sum, not based upon a new consideration, is a mere gratuity. Such a promise, made at the beginning of the employment, is enforceable, though *it would not be if made pending the term* or after the performance was completed.[2]

---

[2] (Citation and punctuation omitted; emphasis in original.) *Mgmt. Search v. Morgan,* 136

Therefore, had the promise of stock in the June 16 letter been a part of the original agreement at the beginning of Marsh's employment, it would have been enforceable, assuming it was sufficiently definite. But based on the unambiguous language of Marsh's employment agreement, no such promise was made at the beginning of Marsh's employment. "Whenever the language of a contract is plain, unambiguous, and capable of only one reasonable interpretation, no construction is required or even permissible, and the contractual language used by the parties must be afforded its literal meaning."[3] The most that can be said of the language in Marsh's employment agreement, i.e., "the Company . . . may pay additional incentive compensation or bonuses," is that BDIL *might* pay Marsh additional compensation. But this discretionary language was, as a matter of law, insufficient to create an enforceable promise.

Therefore, because Marsh's employment contract unambiguously made no enforceable promise of a stock bonus when the employment contract was executed, there was no promise of additional compensation on the part of BDI Distributors in exchange for additional performance on Marsh's part. Accordingly, when the subsequent alleged promise was made in the June 16 letter, there was no additional consideration because in that context the bonus was something extra for which no services were rendered and no return promise was required.[4] As pointed out by BDIL, the June 16 letter did nothing to change Marsh's employment requirements and there was no additional burden taken on by Marsh in return for the stock. Accordingly, the promise of stock was not supported by consideration.

Marsh argues that his continued service to BDIL after the merger provided a basis for the jury to find consideration supporting the promise of stock. However, this ignores the duties Marsh originally agreed to perform under his employment contract. With respect to Marsh's service as an officer or board member of BDIL, the plain, unambiguous language of the contract required Marsh to

> devote his entire working time, attention, skill and energies exclusively to the Business of the Company [BDI] . . . . If Marsh is elected as a director of the Company or as a director or officer of any of its affiliates, the Employee will fulfill his duties as such director or officer without additional compensation.

Ga. App. 651, 653 (1) (222 SE2d 154) (1975).

[3] *First Data POS v. Willis*, 273 Ga. 792, 794 (2) (546 SE2d 781) (2001).

[4] See *Mgmt. Search*, 136 Ga. App. at 653-654 (1).

Therefore, Marsh's continued service to BDI Distributors and its affiliate BDIL was part of his original employment contract, and it could not serve as an additional obligation he performed in exchange for the promise of stock.

Marsh also points to the fact that his employment agreement was assigned to the new operating company, BDI Laguna, Inc., and he argues that his service after the assignment of his employment contract to the new entity constituted consideration for the promise of stock. He argues that because his contract was for personal services, it was not assignable absent the consent of the parties. However, "[a]lthough a duty is generally not delegable where performance by the delegate would vary materially from performance by the original obligor, the parties may nonetheless agree to such an assignment or delegation."[5] Pretermitting whether employment by BDI Distributors' post-merger corporate affiliate would vary materially from BDI Distributors itself, we conclude that the plain and unambiguous language of the contract reflects Marsh's consent to the assignment at the initiation of his employment. Marsh's employment contract states:

> This Agreement shall inure to the benefit of and be binding upon (a) the Company, its Permitted Successors and Assigns, and (b) the Employee, his heirs, guardians and personal and legal representatives. Permitted Successors and Assigns shall mean (i) any corporation or other entity which may acquire all or substantially all of the Company's assets and business, (ii) any corporation or other entity with or into which the Company may be consolidated or merged, or (iii) any corporation or other entity that is the successor corporation or entity in an exchange of stock or partnership interest. The duties and covenants of the Employee under this Agreement are personal and may not be delegated or assigned.

Therefore, while Marsh could not assign his obligations under contract, he explicitly agreed that his obligations inured to the benefit of BDI Distributors *or the successors and assigns described therein.*

Marsh relies on *Gold Kist v. Wilson*[6] to dispute this conclusion, but that case, which is physical precedent only,[7] is not controlling, and its analysis is not persuasive in the present factual context. In

---

[5] *Dennard v. Freeport Minerals Co.*, 250 Ga. 330, 334 (2) (297 SE2d 222) (1982).

[6] 227 Ga. App. 848 (490 SE2d 466) (1997) (physical precedent only).

[7] See Court of Appeals Rule 33 (a) ("If an appeal is decided by a Division, a judgment in

*Gold Kist*, the plaintiffs were farmers who produced eggs or young hens to be marketed by defendant Gold Kist, Inc. When Gold Kist, Inc., sold its egg processing facility, it assigned the plaintiffs' production contracts to the purchaser. Without explanation, citation, or further analysis, this Court held that "[p]hrases in the production contracts which contemplated an assignment thereof did not amount to a consent to an assignment of those contracts. . . ."[8] We do not find this logic applicable in the present factual scenario, in which it is undisputed that all parties contemplated an impending sale of BDI Distributors, and the contract itself explicitly stated that Marsh's employment would be for the benefit of BDI Distributors' successors and assigns.

Finally, any prior or subsequent oral communications between Marsh and Wertheimer or Marsh's employers are immaterial to Marsh's compensation under his employment agreement because the contract contained the following merger clause:

> This Agreement contains the entire agreement of the parties with respect to the subject matter hereof, and supersedes all prior agreements and understandings, oral or written, between the parties hereto with respect to the subject matter hereof. This Agreement may be amended, changed, modified, extended or rescinded only by a writing signed by the party against whom any such amendment, change, modification, extension or rescission is sought.

Therefore, as there was no evidence of a signed writing amending the agreement, Marsh's compensation was governed by the language of his employment agreement, which did not create an enforceable promise of a stock distribution. The June 16 letter, to the extent that it was sufficiently definite, was not an amendment to the employment agreement; rather, it was merely notice of a stock payment to be made in the discretion of the chief executive officer, as contemplated by the discretionary payment provision of Marsh's employment contract. Therefore, the trial court erred in denying BDIL's motion for directed verdict.

BDIL's remaining enumerations are moot.

---

which all three judges fully concur is a binding precedent; provided, however, an opinion is physical precedent only with respect to any Division of the opinion for which there is a concurrence in the judgment only or a special concurrence without a statement of agreement with all that is said.").

[8] *Gold Kist*, 227 Ga. App. at 852 (2).

## *Case No. A09A0991*

In Case No. A09A0991, Marsh cross-appeals from (1) the grant of summary judgment to BDIL on his claims for breach of trust, conversion, and tortious deprivation; (2) the grant of BDIL's motion for j.n.o.v. as to the tax "gross-up" portion of the verdict; and (3) the grant of a directed verdict to the former chief executive officer of BDIL.

2. With respect to the first two enumerations, Marsh's arguments are moot in light of our holding in Case No. A09A0990. Marsh's claims against BDIL for breach of trust, conversion, and tortious deprivation all depend on either a breach of a duty to provide stock or a wrongful withholding of stock to which Marsh either was entitled or already had title.[9] However, as we concluded in BDIL's appeal, any promise of stock was not enforceable, a stock award under Marsh's employment agreement was within the sole discretion of the chief executive officer, and the company was therefore within its rights to offer Marsh, as it did, stock options as opposed to stock itself. Therefore, these enumerations present nothing for review.

3. In his final enumeration, Marsh challenges the trial court's grant of a directed verdict to Wertheimer regarding Marsh's claim that to entice Marsh to work at BDI Distributors, Wertheimer made a separate oral promise to pay him a stock commission upon the sale of Wertheimer's interest in BDI Distributors, amounting to between eight and fifteen percent of the stock of the company. However, Marsh's subsequent written employment agreement, which contained a merger clause, did not contain such a promise.

It is axiomatic that contracts must be construed to give effect to the parties' intentions, which must whenever possible be determined from a construction of the contract as a whole. Whenever the language of a contract is plain, unambiguous, and capable of only one reasonable interpre-

---

[9] See *Levenson v. Word*, 294 Ga. App. 104, 106 (1) (668 SE2d 763) (2008) ("Conversion consists of an unauthorized assumption and exercise of the right of ownership over personal property belonging to another, in hostility to his rights; an act of dominion over the personal property of another inconsistent with his rights; or an unauthorized appropriation.") (punctuation omitted); *Monterrey Mexican Restaurant of Wise v. Leon*, 282 Ga. App. 439, 446-447 (2) (638 SE2d 879) (2006) (describing tortious deprivation as the prevention of the "exercise of intangible rights of the kind customarily merged in a document is subject to a liability similar to that for conversion") (citation, punctuation and emphasis omitted); *All Business Corp. v. Choi*, 280 Ga. App. 618, 621 (1) (634 SE2d 400) (2006) ("An action for breach of trust cannot lie absent evidence of a fiduciary duty. A claim for breach of fiduciary duty requires proof of three elements: (1) the existence of a fiduciary duty; (2) breach of that duty; and (3) damage proximately caused by the breach.") (punctuation omitted).

tation, no construction is required or even permissible, and the contractual language used by the parties must be afforded its literal meaning. Where a conflict exists between oral and written representations, it has long been the law in Georgia that if the parties have reduced their agreement to writing, all oral representations made antecedent to execution of the written contract are merged into and extinguished by the contract and are not binding upon the parties. In written contracts containing a merger clause, prior or contemporaneous representations that contradict the written contract cannot be used to vary the terms of a valid written agreement purporting to contain the entire agreement of the parties. . . .[10]

Here, as alleged in Marsh's amended complaint, he entered into the employment agreement "to increase the marketable goodwill of the company in preparation for efforts to sell the company." The employment agreement contained a merger clause stating that the "[a]greement contains the entire agreement of the parties with respect to the subject matter hereof, and supersedes all prior agreements and understandings, oral or written, between the parties hereto with respect to the subject matter hereof." Because the employment agreement established the entire agreement as to Marsh's compensation for coming to work at BDI Distributors and its successors, Marsh could not enforce a prior oral promise to pay him a percentage of the company stock offered to entice him to work at BDI Distributors. That Wertheimer made substantial extra cash payments to Marsh during his employment does not change this result because those subsequent payments were gratuitous and made in Wertheimer's "sole and absolute discretion" as chief executive officer pursuant to Marsh's employment agreement.[11] Further, any subsequent oral discussion of a stock commission purporting to modify the terms of the agreement would not have been enforceable because modifications of the employment agreement were required to be in writing. Finally, even if Wertheimer's alleged oral promise to pay Marsh eight to fifteen percent of the stock was not subject to the merger clause, it was not sufficiently definite to be enforceable.

A contract is an agreement between two or more parties for the doing or not doing of some specific thing. In order that

---

[10] (Punctuation and footnotes omitted.) *First Data POS*, 273 Ga. at 794-795 (2).

[11] Indeed, Marsh's appellate brief characterized those extra payments by Wertheimer as an exercise of chief executive officer discretion under the agreement in contemplation of the alleged stock commission promise.

there may be an agreement, the parties must have a distinct intention common to both and without doubt or difference. Until all understand alike, there can be no assent, and, therefore, no contract. Both parties must assent to the same thing in the same sense, and their minds must meet as to all the terms. If any portion of the proposed terms is not settled, or no mode is agreed on by which it may be settled, there is no agreement.[12]

The alleged oral promise to Marsh was that he would receive eight to fifteen percent of the stock depending on the sales price of the company, and according to Marsh, "neither one of us could have predicted at that point" what the sales price would be, and "it would have been impossible to set the exact percentage at that point." Therefore, the "amount of . . . compensation promised [Marsh] was not definite or objectively ascertainable from the promise made,"[13] and the trial court did not err in concluding that the alleged promise was too indefinite to be enforceable.[14]

*Judgment reversed in Case No. A09A0990. Judgment affirmed in Case No. A09A0991. Blackburn, P. J., and Adams, J., concur.*

## ON MOTION FOR RECONSIDERATION.

On motion for reconsideration, Marsh argues that BDIL was able to attract outside investors because of its promise to transfer him stock, and that this benefit was consideration supporting the promise of stock. However, the merger documents that comprise the transaction belie this argument. First, it is undisputed that the outside investors were satisfied by an offer of stock *options* to Marsh and that Marsh was offered those options. Thus, it cannot be said that their investment was contingent on a promise of a stock grant to Marsh. Second, the shareholder agreement setting aside the stock for management employees explicitly stated that "[n]othing contained in this Agreement shall be construed to confer upon any Person who is not a signatory hereto any rights or benefits, as a third party beneficiary or otherwise." (Marsh was not a signatory.) Third, neither the merger agreement nor the shareholder agreement identifies Marsh as a recipient of stock nor states how much he was to

---

[12] (Citation and punctuation omitted.) *Aero Constr. Co. v. Grizzard*, 76 Ga. App. 649, 652 (2) (46 SE2d 767) (1948).

[13] *Jackson v. Ford*, 252 Ga. App. 304, 306 (1) (a) (555 SE2d 143) (2001).

[14] See *Arby's, Inc. v. Cooper*, 265 Ga. 240, 241 (454 SE2d 488) (1995) ("the promise of future compensation must . . . be for an exact amount or based upon a formula or method for determining the exact amount of the bonus") (punctuation omitted).

receive and in what form, leaving the chief executive officer with discretion to determine the details of the stock plan. Therefore, any consideration flowing to BDIL as of the merger date could not have supported a specific promise to give Marsh two percent of stock in the form of actual shares, as opposed to the options he was offered. Accordingly, the motion for reconsideration is denied.

*Motion for reconsideration denied.*

DECIDED NOVEMBER 19, 2009 —
RECONSIDERATION DENIED DECEMBER 16, 2009 —

*Bondurant, Mixson & Elmore, Tiana S. Mykkeltvedt, Jeffrey O. Bramlett, Frank M. Lowrey IV, Corey F. Hirokawa*, for appellant.

*Baker, Donelson, Bearman, Caldwell & Berkowitz, Steven G. Hall, Robert G. Brazier, Kevin A. Stine*, for appellee.