**FIRST DIVISION**
**DOYLE, C. J.,**
**PHIPPS, P. J, and BOGGS, J.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 2, 2016**

# In the Court of Appeals of Georgia

A15A2041. MOSAIC BUSINESS ADVISORY SERVICES, INC.   DO-100
     v. STONE.

DOYLE, Chief Judge.

Following a jury trial, Mosaic Business Advisory Services, Inc., ("Mosaic")

appeals from a monetary award in favor of co-founder Lee Ann Stone in her suit

against Mosaic alleging, in relevant part, breach of an agreement to pay her a

percentage of profit from consulting work she originated and performed on behalf of

Mosaic. Mosaic contends that the trial court erred by denying its motions for a

directed verdict and judgment notwithstanding the verdict ("JNOV"), as well as

denying its request for a jury charge on the enforceability of promises to pay future

compensation. Mosaic predicates all of these arguments on the grounds that (1) there

was inadequate consideration, (2) the alleged agreement was too indefinite to enforce,

and (3) Stone terminated the compensation negotiations prior to reaching an enforceable agreement. For the reasons that follow, we affirm.

> Where a jury returns a verdict and it has the approval of the trial judge, the same must be affirmed on appeal if there is any evidence to support it as the jurors are the sole and exclusive judges of the weight and credit given the evidence. The appellate court must construe the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict. As long as there is some evidence to support the verdict, the denial of defendant's motion for directed verdict, new trial and [JNOV] will not be disturbed.[1]

So viewed, the evidence shows that in 2010, Stone and Merrick Olives left their positions at an established consulting firm to form their own consulting firm, Mosaic Business Advisory Services, Inc. Initially, Stone and Olives discussed having a 49/51 percent ownership in favor of Olives, who is Hispanic, so that Mosaic would have a racial minority ownership status. But when Stone endured financial difficulty causing her to file for bankruptcy, the two decided that Olives would fund the start-up process and be the sole shareholder. Nevertheless, Stone and Olives were both

---

[1] (Punctuation omitted.) *Ins. Indus. Consultants, LLC v. Alford*, 294 Ga. App. 747 (669 SE2d 724) (2008), quoting *Gantt v. Bennett*, 231 Ga. App. 238, 240 (1) (499 SE2d 75) (1998).

officers and directors with equal voting power on the board, and they orally agreed that they would both make decisions jointly, including having equal authority as to compensation. As Olives described it,

> we . . . agreed to run – on a day-to-day management perspective to run [the company] as . . . equal day-to-day managers. I felt like – we both felt like that would be the best way to run the company. So we both could make decisions about, you know, hiring, firing, budgets, all that kind of stuff as equal peers, but from an ownership standpoint, I was the sole owner.

Consistent with this, Mosaic's bylaws provided that the board of directors (composed equally of Olives and Stone) was responsible for fixing the salaries of officers, and Olives agreed that compensation decisions would be made jointly.

In its first year, the young company was not profitable, but by late 2011, the company's revenue was sufficient for Stone and Olives to take annual salaries of $195,000. Stone and Olives also discussed how to distribute 2011 bonuses, and they ultimately agreed that Stone, who had originated the majority of Mosaic's business, would receive a payout of $234,442.09, and Olives would receive $32,549.90 in addition to $80,636.39 as debt repayment. The agreement over these numbers was reflected in a series of emails in late December 2011 and early January 2012 between

3

Olives and Stone, including Olives's statement that "[o]ur agreement was to close 2011 by distributing the estimated 2011 taxable income [according to client originator] and retiring the debt," resulting in the payment amounts stated above. Olives also emailed this information to their accountant, with a copy to Stone, stating, "[y]ou probably got this from [Stone] already, but . . . [h]ere [are] the final numbers we decided [on] to close out 2011."

A few days later, in January 2012, Stone and Olives began having disagreements about 2012 compensation. As part of that process, Olives decided not to pay Stone the full amount of her 2011 bonus, instead paying her $125,000 because of limited cash on hand and because he thought she might be in the process of leaving Mosaic and taking the clients.[2] On January 17, 2012, Olives terminated Stone, based on his understanding of his authority as sole shareholder.

The next day, Olives and Stone exchanged emails and apologies, agreeing to continue discussions about compensation so that Stone would continue her work on behalf of Mosaic and its clients. In the following weeks, the two continued oral and email communications to determine how to divide net profits, with Stone initially

_____

[2] Stone sought payment of the balance of her 2011 bonus, but the jury declined to award her that portion of the damages. There is evidence that Stone agreed to this revised amount.

4

proposing an 80 percent payment to the originating founder, leaving 20 percent remaining in Mosaic to fund operations. Olives voiced a concern that Mosaic needed a higher margin to operate and suggested a 50 percent payment, with the remaining half funding operations. Discussions continued through the end of January 2012.

In the ensuing weeks, Stone and Olives reached a compromise: 65 percent of the net profit would be paid to the founder in charge of the project, with 35 percent remaining in the company for operational expenses. As they tried to finalize other details such as the timing of payments, minimum cash reserves Mosaic should retain, and any safeguards addressing the departure of a founder, discussions about those terms deteriorated, despite Olives's statement that "I think it is 95% of the way there."

By May 2012, Stone had continued to work at Mosaic, and their discussions culminated in the following exchange regarding liquidity reserves, timing, and founder departure:

> Stone: Here are my general thoughts added to your comments below. I thought you might want to see my thoughts so you too can think about it before we talk on Wednesday. We both acknowledge that we have different views on this, and I am assuming that you want as I do to come to a mutually beneficial compromise. If you have an immediate response to any of this, please feel free to send it along; otherwise, we can talk through it more on Wed.

Olives: I'm tired of talking about this. I have no intent to fire you, have agreed to 65% of margins, and the Company will pay it out when it has the cash. You have to decide if that's good enough for you and that you are in this for the long haul. If not, we can have a different conversation on Wednesday.

Stone: Wow, that's not the response I was expecting. . . I see that you cancelled Wednesday's meeting. Thanks a lot. I know this agreement doesn't matter to you, but it did to me. I can see that you are still completely angry about the events of last year – events which you clearly hold me responsible for – so just forget about the compensation agreement. You won't have to talk about it again.

At trial, Stone testified that this reflected her view that they had already agreed to the percentages as to bonus compensation, and a written document detailing the other terms (timing, operating reserves, and founder departure) was not necessary to enforce the bonus component. Consistent with this testimony, the email chain included a mutual agreement on the percentages as well as Olives's statement that, based on client origination and work, Stone would be the only founder eligible to receive bonus compensation scheduled for July 2012, and that Stone should "rest easy that the Company should have plenty of cash to pay your July bonus if current

receivables come in a timely manner." As of June 30, 2012, Mosaic's revenue account had a balance of $328,143.79.[3]

Throughout this process, Stone continued to work at Mosaic based on her belief that they had agreed to 65 percent bonus payments. By the end of May 2012, Stone was able to renew a large client's annual contract for approximately $1.4 million worth of consulting services.

In mid-June 2012, Olives called Stone expressing his desire to unwind the business. Shortly before that telephone call, Olives had asked Stone to identify what client work she was expecting, and she responded, listing her current and expected work. Listing those contacts, Olives drafted a 12-month non-compete agreement, offered Stone $125,000, and suggested she hire counsel for the unwinding. On July 3, 2012, Olives's counsel sent Stone a letter demanding that she cease and desist any breaches of her fiduciary duty owed to Mosaic, and on July 6, 2012, Stone tendered her resignation letter.

After her departure, Stone sought payment of the remaining portion of her 2011 bonus as well as the unpaid mid-year bonus scheduled for July 2012. When Mosaic did not pay, Stone sued Olives and Mosaic, asserting claims for declaratory judgment

---

[3] At trial, Stone calculated her 2012 mid-year bonus to be $285,223.

as to Stone's interest as a shareholder, breach of contract, unjust enrichment, breach of fiduciary duty, fraudulent inducement, an accounting, and a constructive trust. Following discovery, the case was tried by a jury which found in favor of Stone on her breach of contract claim for the 2012 mid-year bonus, awarding her $245,723.09. The jury found in favor of the defendants on all other claims. Mosaic now appeals, citing as error the trial court's denial of its motions for a directed verdict and JNOV, as well as the trial court's refusal to instruct the jury on the enforceability of promises to pay future compensation.

1. Mosaic contends that the alleged promise of a 2012 mid-year bonus was not enforceable because it did not occur at the beginning of Stone's employment with Mosaic and was therefore a mere gratuity lacking consideration.[4] We disagree, based on the facts before us.

As a general matter, it is true that when

one undertakes to perform for another service or labor for a given sum, any amount paid in excess of that sum, not based upon a new consideration, is a mere gratuity. Such a promise, made at the beginning

---

[4] See *Arby's, Inc. v. Cooper*, 265 Ga. 240, 241 (454 SE2d 488) (1995) ("To be enforceable, a promise of future compensation must be made at the beginning of the employment.").

of the employment, is enforceable, though *it would not be if made pending the term* or after the performance was completed.[5]

But Mosaic's application of this rule oversimplifies the present factual context, which involved a negotiation between company founders and directors over their compensation package, which negotiation arose at the time one was terminated and subsequently resumed her position for the purpose of coming to terms about compensation. When viewed in the light most favorable to Stone,[6] these facts authorized the jury to find a quid pro quo – that Stone would remain at Mosaic in return for an agreed-upon compensation package – sufficient to establish consideration and an enforceable bonus agreement. Stone specifically testified that she never would have remained at Mosaic had she not understood there to be an agreement at least as to the 65 percent bonus payments, and Olives's emails reflect

---

[5] (Punctuation omitted; emphasis in original.) *BDI Laguna Holdings, Inc. v. Marsh*, 301 Ga. App. 656, 658 (1) (689 SE2d 39) (2009), quoting *Mgmt. Search, Inc. v. Morgan*, 136 Ga. App. 651, 653 (1) (222 SE2d 154) (1975).

[6] See generally *Scapa Dryer Fabrics, Inc. v. Knight*, 332 Ga. App. 82, 83-84 (1) (770 SE2d 334) (2015) ("Neither a directed verdict nor a [JNOV] can be granted where there is some evidence to support the verdict. Where evidence is in conflict, the grant of such motions is error. Only when there is no evidence to support the verdict can either a directed verdict or [JNOV] be granted, because the evidence demands a verdict contrary to that returned by the jury.").

his agreement with that element of their negotiations, as well as his assurance that Stone would be paid a bonus in July 2012 as discussed. As correctly pointed out by the trial court, this Court has held under analogous facts that an employee's continued employment in the face of a departure can constitute consideration sufficient to make a mid-term promise of future compensation enforceable.[7] Accordingly, based on the record before us, Mosaic's argument that the verdict was unauthorized based on a lack of consideration is without merit.[8]

---

[7] See, e.g., *Hiers v. ChoicePoint Svcs.*, 270 Ga. App. 128, 129 (1) (606 SE2d 29) (2004) ("continued employment constitutes valid consideration for the commissions that [employer] promised to pay"); *Edwards v. Grapefields, Inc.*, 267 Ga. App. 399, 406 (2) (599 SE2d 489) (2004) (finding "evidence that [employee's] shares were issued in return for a promise of his continued employment, which would constitute valid consideration"); *Mon Ami Intl., Inc. v. Gale*, 264 Ga. App. 739, 743 (2) (592 SE2d 83) (2003) ("[T]he adequacy of consideration must be tested by the facts and conditions existing at the time the contract was made[, and] continued employment constitutes valid consideration[.]") (punctuation omitted). We note that Mosaic also enumerates a closely-related argument that "a promise to pay a bonus in the future is not enforceable under a terminable-at-will employment contract." *Stover v. Candle Corp. of America*, 238 Ga. App. 657, 659 (2) (520 SE2d 7) (1999). But the evidence shows that the bonus payments Stone sought were for work she had already performed for Mosaic as of July 2012, after an agreement had been reached as to bonus payouts. "Even in an at-will agreement, the employer is not at liberty to change the agreed rate of pay after the associated work has been performed." *Cox v. Erwin*, 246 Ga. App. 439, 440 (2) (541 SE2d 69) (2000).

[8] See *Sims v. Bayside Capital, Inc.*, 327 Ga. App. 47, 50 (1) (755 SE2d 520) (2014) ("Where there is a conflict in the evidence as to the existence of an oral contract or as to its terms, the matter must be submitted to a jury for resolution.").

10

2. Mosaic also contends that any agreement as to bonus payments was too indefinite to be enforceable.[9] Mosaic points to the ongoing disagreement as to the minimum amount of liquidity reserves that Mosaic would maintain, and argues that this resulted in no agreement as to the pool from which the 65 percent bonus would be drawn. But there was evidence showing that the liquidity cushion was a set dollar amount of cash reserves that Mosaic would maintain,[10] not the pool against which bonuses would be drawn. As such, the liquidity cushion might bear on the timing of payments, but not the amount.

This conclusion is supported by emails from Olives stating his concern for maintaining a sufficient operating cash buffer and, as to timing, reassuring Stone that she should "rest easy that the Company should have plenty of cash to pay your July bonus if current receivables come in a timely manner." As recounted by Olives in an email to Stone, "I . . . have agreed to 65% of margins, and [Mosaic] will pay it out when it has the cash. . . We've talked through all that and ended up at 65%. Yes,

---

[9] See *Arby's, Inc.*, 265 Ga. at 241 ("[T]he promise of future compensation must . . . be for an exact amount or based upon a [definite] 'formula or method for determining the exact amount of the bonus.'"), citing *Christensen v. Roberts of Atlanta*, 189 Ga. App. 289, 291-292 (2) (375 SE2d 267) (1988).

[10] The latest round of emails reflects an agreement that this amount would be $50,000.

11

agreed, and please remember that I too compromised." There also was testimony from Olives that these margins would be calculated according to "total revenue less the cost" associated with the project, which could be determined according to the financial records kept for each client account. Therefore, based on the evidence at trial, any disagreement as to the amount of liquidity reserves did not render the bonus agreement too indefinite to be enforced.

Mosaic also argues that there was no agreement as to a method for determining bonus amounts for hypothetical projects that were shared or jointly originated. But there was evidence that Stone was the sole originator of the accounts giving rise to the disputed bonus payment, and that Olives had not materially contributed to those accounts. For example, in an email, Olives conceded that Stone was the only person eligible for a July 2012 bonus. Therefore, any uncertainty as to joint projects did not render unenforceable their agreement as to the July 2012 bonus payment.

3. Mosaic also argues that Stone cannot enforce the bonus agreement because she terminated the negotiations before any agreement was finalized. In light of our preceding analysis as to the agreement on material terms of the bonus structure, and the evidence supporting Stone's trial testimony that she believed she had an agreement as to the terms of bonus payments and that she would not have continued

her employment at Mosaic absent such an agreement, this argument fails. "Because the factfinder in this case found the existence of a contract, the appellate courts are relegated to the position of determining whether or not there was any evidence in the case to support that conclusion."[11] Although Mosaic disputes that conclusion based on other evidence, "because the evidence conflicted, the trial court properly denied [the defendant's] motion for a directed verdict on this issue. The jury was not required to accept [the defendant's] evidence. There was some evidence to support the jury's verdict, and on this ground we must affirm the judgment entered on that verdict."[12]

4. Last, Mosaic argues that the trial court erred by failing to instruct the jury as follows: "In order to enforce a promise of future compensation, Plaintiff must prove (1) that the promise was made at the beginning of the Plaintiff's employment and (2) that the promise was for an exact amount or based upon a formula or method for determining the exact amount of the bonus."[13]

---

[11] (Punctuation omitted.) *Masters v. Redwine*, 279 Ga. 432 (1) (615 SE2d 118) (2005).

[12] *Underground Festival v. McAfee Eng. Co.*, 214 Ga. App. 243, 246 (2) (447 SE2d 683) (1994).

[13] See *Arby's, Inc.*, 265 Ga. at 241.

[E]ven if we assume that the requested charge was correct and pertinent, it is not necessarily error to fail to charge it. We must look to the charge as a whole to determine whether the court substantially covered the principles embodied therein or whether it was sufficiently or substantially covered by the general charge. Further, a party cannot successfully complain about the refusal to give a requested charge unless they satisfy their burden of showing that the refusal was both erroneous and harmful.[14]

Here, the trial court's jury charge included the following instructions:

To constitute a lawful contract, there must be parties able to contract, a consideration for the contract, the agreement of the parties to the terms of the contract, and a lawful subject matter.

A consideration is valid if any person who promised is entitled to a benefit. To constitute consideration, *a performance or return promise must be bargained for by the parties to a contract. A performance or returned promise is bargained for if it is sought by one party in exchange for his or her promise and is given by the other party in exchange for that promise. Past consideration alone cannot support the existence of a contract.*

. . . Until both parties have agreed to all of its [sic], there is no contract until the contract is agreed to, a party may withdraw an offer or proposal. . . .

---

[14] *Giles v. Heyward*, 315 Ga. App. 409, 412 (4) (726 SE2d 434) (2012).

14

For an oral contract to be sufficiently . . . definite to be enforced, the oral contract must have been expressed in language sufficiently plain and explicit to convey what the parties agreed upon. . . *A contract does not exist until the parties agree on all material terms. A contract cannot be enforced if its terms are incomplete, vague, indefinite or uncertain.*[15]

Mosaic's requested charge essentially emphasizes that the terms of a contract must not be vague or uncertain and that a promise of compensation must be based on some valid consideration.[16] As demonstrated by the emphasized language above, these concepts were substantially covered by the instructions given by the trial court, so the court's failure to give Mosaic's requested charge does not amount to reversible error.

*Judgment affirmed. Phipps, P. J., and Boggs, J., concur.*

---

[15] (Emphasis supplied.)

[16] Cf. *Hiers*, 270 Ga. App. at 129 (1) ("continued employment constitutes valid consideration"); *Mon Ami Intl., Inc.*, 264 Ga. App. at 742-743 (2) (addressing the adequacy of consideration for an employment contract).