**FIRST DIVISION
BARNES, P. J.,
LAND and, WATKINS, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules**

**July 27, 2023**

# In the Court of Appeals of Georgia

A23A1096. ALPHA GENOMIX LABORATORIES, INC. et al v. CRANDALL.

BARNES, Presiding Judge.

Shane Crandall sued Alpha Genomix Laboratories, Inc. ("Alpha") and Consultative Genomics, LLC ("ConGen"), alleging that they owed him severance benefits under his employment contract. Following a bench trial, the trial court entered final judgment in favor of Crandall on his claims for breach of contract and awarded him damages. On appeal, the defendants contend that the judgment should be reversed because Crandall's employment contract failed for lack of consideration; the employment contract was unenforceable because Alpha's CEO and Crandall violated their fiduciary duties and acted in bad faith in executing the contract; there was no "change in control" that triggered the payment of severance benefits under the

employment contract; ConGen did not assume liability for breach of the employment contract when it acquired all of Alpha's shares; Crandall was barred from bringing suit under a contractual indemnification provision; and the severance provision of the employment contract was invalid because it violated the federal Eliminating Kickbacks in Recovery Act ("EKRA"), 18 USC § 220.

For the reasons discussed below, we vacate the judgment in part and remand for the trial court to consider under the proper legal framework whether ConGen assumed liability for breach of the employment contract when it acquired the shares of Alpha. On remand, the trial court also should address two other issues that were raised below but were not ruled on by the court in its judgment: whether Crandall's claims are barred by the contractual indemnification provision or by EKRA. We affirm the judgment in all other respects.

Construed in favor of the judgment,[1] the evidence presented at the bench trial showed that Alpha is a medical testing laboratory located in Peachtree Corners, Georgia, which was acquired by ConGen in December 2018. Before the acquisition, Alpha was owned by 28 shareholders. The shareholders did not take part in the day-

---

[1] See *Gibson v. Gibson*, 301 Ga. 622, 624 (801 SE2d 40) (2017).

to-day operations of Alpha and did not vote on operational issues like the execution of contracts. One of Alpha's shareholders, Hani El Shawa, served as its CEO and on its three-member Board of Directors. Alpha's largest shareholder, Richard Sasnett, served as its Executive Vice President of Sales and as a Board member. Prior to December 2018, Alpha had no bylaws governing its officers and directors.

*Crandall's Employment at Alpha before the ConGen Acquisition.* In April 2016, Alpha hired Crandall to serve as an Area Sales Director. While serving in that position, Crandall reported to Sasnett. In the summer of 2017, Crandall engaged in discussions with El Shawa, Sasnett, and another Area Sales Director about developing and marketing new product lines. As a result of those discussions, El Shawa and Sasnett made the decision to promote Crandall to a newly created position of National Sales Director — Oncology & Women's Health, where he would continue to report to Sasnett but would have expanded job responsibilities. In his new position, Crandall would lead sales representatives in their efforts to identify physicians who had patients who could benefit from Alpha's testing capabilities. However, Crandall would not have authority to hire or fire employees, set employees' salaries, or sign employment contracts on behalf of Alpha.

In light of his promotion, the parties agreed that Alpha would provide Crandall with a new employment agreement that included an increase in salary and commissions. Additionally, because there was talk at Alpha that it might be acquired by another entity or become a publicly traded company, the parties agreed that Crandall's new employment agreement would include a severance provision addressing a change in control in the management of the company.

Crandall began serving in his new National Sales Director position based on assurances from El Shawa and Sasnett that his written employment agreement soon would be finalized, with its terms and conditions applied retroactively. El Shawa provided Crandall with several drafts of the employment agreement over the ensuing months. The draft agreements were prepared by Alpha's counsel, who also were shareholders of the company. All three of Alpha's Board members (El Shawa, Sasnett, and the third member) were aware of the negotiations and discussed with legal counsel the terms and conditions to include in Crandall's employment agreement.

In May 2018, El Shawa emailed Crandall the version of the employment agreement that ultimately was executed by the parties. After several more months passed in which Crandall continued to inquire about when his employment agreement

would be executed, El Shawa called Crandall to his office on December 12, 2018. On that date, El Shawa, in his capacity as Alpha's CEO, and Crandall signed the employment agreement ("Employment Agreement" or "Agreement"). El Shawa, Sasnett, and other members of Alpha's executive management team also signed new employment agreements at the same time as Crandall.

Crandall's Employment Agreement included an increase in salary and commissions in return for Crandall serving in his new National Sales Director position. The Employment Agreement established an initial two-year term for Crandall's employment in his new position, subject to renewal, and included several provisions addressing termination of Crandall's employment and severance pay in the event of his termination. Among other severance provisions, the Employment Agreement included a provision pertaining to a change in control in management at Alpha that is at the center of the dispute in this case ("Change-in-Control Provision"). The Change-in-Control Provision stated:

> **7.5 *By Employee upon a Change of Control.*** (a) In the event of a Change in Control (as defined below), Employee [Crandall] shall have the right to terminate his employment hereunder by giving a written notice of termination to the Company [Alpha] within ninety (90) days after the date a Change in Control occurs. If Company terminates

Employee's employment (or provides a notice of termination to Employee) within the ninety (90) day period after the date a Change in Control occurs and such termination is not for Cause pursuant to **Section 7.4** above, such termination shall have the same effect as if the Employee had submitted his notice of termination to the Company pursuant to this **Section 7.5**. The parties agree that, if Employee terminates his employment pursuant to this **Section 7.5** (or is deemed to have terminated his employment pursuant to this **Section 7.5** as provided in the previous sentence), Employee shall be entitled to the following benefits:

(i) *Base Salary*. Employee shall receive his then current Base Salary for a period of twelve (12) months following the Termination Date payable in the same manner as it was being paid as of the Termination Date (subject to withholding of all applicable taxes). Alternatively, Company in its sold discretion, may pay the amounts owed to Employee in this **Section 7.5 (a) (i)** in one lump sum payment, subject to withholding of all applicable taxes.

(ii) *Commission*. The Company shall pay Employee an amount equal to the Commission paid to Employee pursuant to **Section 4.2** during his last full employment year. Said amount shall be payable in one lump sum payment, subject to withholding of all applicable taxes.

(iii) *Health Coverage, Life Insurance, and Disability Insurance*. The health, group term life, and disability insurance benefits coverage in effect at Employee's date of termination shall be continued at the

same level and in the same manner as if his employment under this Agreement had not terminated . . . , beginning on the Termination Date and ending on the date that is twelve (12) months from the Termination Date. . . .

(b) For purposes hereof, a "Change in Control" as used herein shall be deemed to have occurred if there is a change in the CEO and/or Executive Vice President of Sales of the Company.

(Emphasis in original.) The Employment Agreement was backdated, consistent with the assurances received by Crandall that the new salary, commissions, and severance provisions would apply retroactively since he already began serving in his new position, and the Agreement further provided that it would "be binding upon [Alpha] and its successors and assigns."

*ConGen's Acquisition of Alpha.* While Alpha's business did well in 2017, changes in Medicare regulations for lab reimbursement in 2018 caused the company significant financial hardship. In the summer of 2018, Alpha formed a business arrangement with ConGen under which ConGen assisted Alpha in improving its billing and collection practices. Subsequently, Alpha and ConGen entered into negotiations over a possible acquisition of Alpha by ConGen. Crandall was not involved in the negotiations between Alpha and ConGen, and he did not learn of the

potential acquisition until late November 2018, after he had already received the final version of his Employment Agreement for execution.

Alpha and ConGen ultimately reached an agreement under which the shares of all of Alpha's shareholders would be transferred to ConGen, and in exchange ConGen would pay a guaranteed special distribution to Alpha's shareholders and would provide them with membership units in ConGen ("Share Exchange Agreement"). The Share Exchange Agreement recited that Alpha would become a wholly owned subsidiary of ConGen as a result of the acquisition.

During a shareholders' meeting held on December 5, 2018, Alpha's shareholders for the first time adopted bylaws for the company, and they also voted to approve the Share Exchange Agreement. Crandall, who had become a shareholder of Alpha, voted in favor of the Share Exchange Agreement. The Share Exchange Agreement subsequently was signed on December 19, 2018 and became effective on that date, which was a few days after Crandall executed his Employment Agreement. Around that same time, Crandall was told to report to a new Vice President of Sales and Operations, Dino Dakuras, and from that point forward, Crandall began providing sales projections and other information to Dakuras rather than Sasnett.

Following the acquisition, Alpha continued to collect revenue, pay bills, and maintain a lab for the processing of specimens. Alpha remained in existence for marketing purposes and because it held licenses for laboratory work that could not be transferred to ConGen and had ongoing debts and liabilities that needed to be resolved. However, El Shawa announced in an email that the new business "construct" resulting from the acquisition would possess all of the "intellectual property, tradenames, assets, etc." of Alpha. With respect to its employees, Alpha transferred all of its employee benefits and insurances plans to ConGen, and Alpha's 401 (k) plan was terminated and its employees were moved to ConGen's plan. Alpha announced that its employees would transition to ConGen, and ConGen made offers of employment to Alpha's employees, including members of its executive leadership. El Shawa provided an update in an email regarding the "integration of the Alpha/ConGen teams" and included a list of changes in leadership.

El Shawa and Sasnett accepted new offers of employment with ConGen. El Shawa became ConGen's Chief Operating Officer, and Sasnett became Executive Vice President of Enterprise Sales. In contrast, Crandall declined ConGen's offer of employment. On January 22, 2019, Crandall provided written notice that he was terminating his employment under his Employment Agreement, and he demanded

9

severance benefits pursuant to the Change-In-Control Provision. Alpha and ConGen rejected Crandall's demand for severance.

*The Litigation.* Crandall subsequently brought the present action for breach of his Employment Agreement against Alpha and ConGen, alleging that Alpha, and ConGen as Alpha's subsequent owner and successor-in-interest, were liable for failing to pay the severance benefits owed to him under the Change-in-Control Provision. According to Crandall, the Change-in-Control Provision was triggered because there was a change in Alpha's CEO and Executive Vice President of Sales after ConGen acquired Alpha.

The defendants answered, denying liability. According to the defendants, Alpha remained a separate entity after the acquisition of its shares by ConGen, and El Shawa was still Alpha's CEO and Sasnett was still Alpha's Executive Vice President of Sales when Crandall terminated his employment with Alpha. The defendants also maintained that the Employment Agreement was unenforceable due to a lack of consideration, and because execution of the Agreement was done in bad faith and constituted a breach of fiduciary duty by El Shawa and Crandall. The defendants further argued that ConGen only acquired the shares of Alpha and did not assume liability for breach of the Employment Agreement. Additionally, the

10

defendants asserted that Crandall's claims were barred under an indemnification provision contained in the Share Exchange Agreement and that the Change-in-Control Provision was unenforceable because it violated EKRA, 18 USC § 220.

After a two-day bench trial, the trial court entered a detailed final judgment in favor of Crandall and against the defendants on the breach-of-contract claims. The trial court determined that there was sufficient consideration for the Employment Agreement, finding that

> [Alpha] induced [Crandall] to continue [his] employment in a new role. . . . [Alpha] promised that if [Crandall] would continue [his] employment, [he] would be compensated in the event of any subsequent change in control at [Alpha]. [Crandall] agreed, and [Crandall] performed by continuing [his] employment in reliance upon the promises made to [him] in the [Employment Agreement], specifically including the promise of compensation in the event of a change in control.

Additionally, the trial court ruled that El Shawa acted properly within his authority as Alpha's CEO in entering into the Employment Agreement on behalf of Alpha and that the Agreement was binding on Alpha. The trial court further found there had been a change in control in Alpha's Executive Vice President of Sales because after Alpha's acquisition by ConGen, "Sasnett's role was changed, and under the new

11

organization [Crandall] was set to report to a new Executive Vice President of Sales and Operations, Dino Dakuras." Furthermore, the trial court found that the transaction between Alpha and ConGen was "in the form of a share exchange agreement," but the court also referred to the "merged corporation" created by the transaction and ruled that ConGen

> assumed the obligations of [Alpha]. Therefore, [ConGen] assumed the obligations imposed upon [Alpha] in [the Employment Agreement]. One of those assumed obligations was the obligation to compensate [Crandall] in the event of a change in control.

Based on its findings and conclusions, the trial court awarded Crandall damages against the defendants in the principal sum of $293,250.72, plus post-judgment interest and court costs. The trial court thereafter entered an amended judgment denying Crandall's claim for attorney fees under OCGA § 13-6-11. This appeal followed.

> On appellate review of a bench trial, the factual findings shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses. The clearly erroneous test is the any evidence rule. If there is any evidence to support the findings of fact by a trial court sitting without a jury, then the appellate court affirms without interference with or

disturbing such factfindings. We review any questions of law decided by the trial court, however, de novo.

(Citations and punctuation omitted.) *Agricommodities v. Moore*, 359 Ga. App. 1, 2, (854 SE2d 781) (2021). Guided by this standard of review, we turn to the defendants' enumerations of error.

1. The defendants contend that the trial court erred in entering judgment in favor of Crandall because the promise to pay him severance in the event of a change in control was unenforceable due to a lack of consideration. The defendants argue that because Crandall signed his Employment Agreement several months after he began serving in his new role as Alpha's National Sales Director and after he began receiving an increased salary and commissions for that position, there was no new consideration provided by Crandall for the additional promises made by Alpha in the Agreement, including the promise to pay Crandall severance in the event of a change in control. Consequently, the defendants contend that the promise to pay Crandall severance was a mere gratuity that could not be enforced.

"Consideration is an essential element of a contract, and total failure of consideration renders the contract null and void." (Punctuation and footnotes omitted.) *Ball-Rodriquez v. Progressive Premier Ins. Co. of Ill.*, 367 Ga. App. 481,

13

483 (__ SE2d __) (2023). "A valuable consideration consists in some right, interest, profit, or benefit accruing to the party who makes the contract; or some forbearance, detriment, loss, responsibility or act, labor or service, on the other side." (Citation and punctuation omitted.) *Lee v. Choi*, 323 Ga. App. 370, 373 (1) (754 SE2d 371) (2013).

It is true that "a promise to perform a preexisting contractual obligation does not constitute consideration for a new agreement." *Glisson v. Glob. Security Svcs.*, 287 Ga. App. 640, 641-642 (2) (653 SE2d 85) (2007). Thus,

> where one undertakes to perform for another service or labor for a given sum, any amount paid in excess of that sum [by the employer], not based upon a new consideration [supplied by the employee], is a mere gratuity. Such a promise, made at the beginning of the employment, is enforceable, though *it would not be if made pending the term* or after the performance was completed.

(Citation and punctuation omitted; emphasis in original.) *BDI Laguna Holdings v. Marsh*, 301 Ga. App. 656, 658 (1) (689 SE2d 39) (2009) (concluding that promise to pay stock to employee was unenforceable for lack of consideration, where the employee "was already obligated under his employment contract to perform duties allegedly supporting the promise of stock"). But the present case did not involve a

14

mere promise by Crandall to perform a preexisting contractual obligation, as shown by the evidence when construed in the light most favorable to the judgment.

Viewed in that light, the evidence showed that Crandall was promoted and began serving in his new National Sales Director position at Alpha when the terms of his new written employment agreement were still in the process of being finalized, and only after he received assurances from El Shawa and Sasnett that he would be provided a new agreement that included increased compensation and severance benefits. The evidence further showed that after starting his new position, Crandall repeatedly inquired about the status of his employment agreement until its terms were finalized and the contract was executed. These facts, construed in favor of Crandall, authorized the trial court to find that Crandall's continued employment in his new position was contingent on the parties reaching agreement on and finalizing a new employment agreement that included severance benefits. In other words, the trial court was authorized "to find a quid pro quo" — that Crandall would remain in his new position at Alpha in return for an agreed-upon compensation and severance package. *Mosaic Business Advisory Svcs. v. Stone*, 336 Ga. App. 28, 32 (1) (784 SE2d 426) (2016). And that type of quid pro quo was sufficient to establish consideration for and the enforceability of the Employment Agreement, including the Change-in-

Control Provision. See id. (concluding that employer's promise to pay employee bonus was supported by sufficient consideration, where the evidence supported a finding that the promise was made in return for the employee remaining at the company); *Edwards v. Grapefields, Inc.*, 267 Ga. App. 399, 406 (2) (599 SE2d 489) (2004) (holding that employee's promise to continue in his employment provided sufficient consideration); *Mon Ami Intl. v. Gale*, 264 Ga. App. 739, 743 (2) (592 SE2d 83) (2003) (noting that "continued employment constitutes valid consideration"). The trial court therefore was authorized to find the Employment Agreement, and the Change-in Control Provision contained therein, was supported by consideration.

2. The defendants also maintain that the trial court erred in determining that the Employment Agreement was binding against Alpha because El Shawa and Crandall breached their fiduciary duties owed to Alpha shareholders by executing the Employment Agreement. According to the defendants, because El Shawa was concerned that he would be removed as Alpha's CEO, he orchestrated a self-interested scheme of having new employment agreements drawn up for himself and other executives (including Crandall) that contained change-in-control provisions to discourage his removal, and then executed those agreements purportedly on behalf

16

of Alpha. The defendants further maintain that El Shawa did not inform Alpha's shareholders about Crandall's Employment Agreement (or about his own new employment agreement or that of several other executives that he signed) because he wanted to keep his self-dealing hidden from them. Additionally, the defendants argue that Crandall conspired with El Shawa in El Shawa's scheme of bad faith and self-dealing and failed to act in the best interests of Alpha.

"It is well settled that corporate officers and directors have a fiduciary relationship to the corporation and its shareholders and must act in good faith." (Citation and punctuation omitted.) *Lambeth v. Three Lakes Corp.*, 357 Ga. App. 546, 549 (1) (851 SE2d 181) (2020). See OCGA §§ 14-2-830 (a);[2] 14-2-842 (a).[3] There is a presumption, subject to rebuttal based on evidence of a gross deviation from the standard of care, that the process followed by an officer or director in arriving at a

---

[2] OCGA § 14-2-830 (a) provides: "A director shall perform his or her duties as a director in good faith and with the degree of care an ordinarily prudent person in a like position would exercise under similar circumstances."

[3] OCGA § 14-2-842 (a) provides: "An officer shall perform his or her duties in good faith and with the degree of care which an ordinarily prudent person in a like position would use under similar circumstances."

17

decision was done in good faith and with the exercise of ordinary care. See OCGA

§§ 14-2-830 (c);[4] 14-2-842 (c).[5] Furthermore,

> [t]he business judgment rule . . . generally precludes claims against officers and directors for their business decisions that sound in ordinary negligence, except to the extent that those decisions are shown to have been made without deliberation, without the requisite diligence to ascertain and assess the facts and circumstances upon which the decisions are based, or in bad faith.

*Lambeth*, 357 Ga. App. at 549 (1), quoting *Fed. Deposit Ins. Corp. v. Loudermilk*,

295 Ga. 579, 585 (1) (761 SE2d 332) (2014). Mindful of these principles, we turn to

whether the evidence demanded a finding that El Shawa and Crandall breached their

---

[4] OCGA § 14-2-830 (c) provides:
There shall be a presumption that the process a director followed in arriving at decisions was done in good faith and that such director has exercised ordinary care; provided, however, that this presumption may be rebutted by evidence that such process constitutes gross negligence by being a gross deviation of the standard of care of a director in a like position under similar circumstances.

[5] OCGA § 14-2-842 (c) provides:
There shall be a presumption that the process an officer followed in arriving at decisions was done in good faith and that such officer has exercised ordinary care; provided, however, that this presumption may be rebutted by evidence that such process constitutes gross negligence by being a gross deviation of the standard of care of an officer in a like position under similar circumstances.

18

fiduciary duties and acted in bad faith in executing the Employment Agreement. We conclude that the evidence did not demand such a finding.

(a) With respect to El Shawa, the trial court was entitled to find that he acted within the scope of his authority as CEO when he negotiated and executed Crandall's Employment Agreement on Alpha's behalf. Under the Georgia Business Corporation Code (the "Business Code"),

> [u]nless the articles of incorporation, bylaws, or action of the board of directors of a corporation provide otherwise, the *chief executive officer* . . . of a corporation shall have authority to conduct all ordinary business on behalf of such corporation and *may execute and deliver on behalf of a corporation any contract*, conveyance, or similar document not requiring approval by the board of directors or shareholders as provided in this chapter.

(Emphasis supplied.) OCGA § 14-2-841. And the evidence at trial showed that prior to December 2018, Alpha had no bylaws in place that constrained the duties of its CEO, and that the bylaws adopted by Alpha in December 2018, shortly before execution of the Employment Agreement, placed no restrictions on the ability of the CEO to negotiate or enter into employment contracts on behalf of the company. Nor was there evidence of any other corporate documents that constrained the ability of El Shawa as Alpha's CEO to sign the Employment Agreement. The trial court

19

therefore was entitled to find that El Shawa had authority to negotiate and execute the Employment Agreement on behalf of Alpha and therefore to bind the company to that Agreement. See *Tattersall Club Corp. v. White*, 232 Ga. App. 307, 308-309 (1) (a) (501 SE2d 851) (1998) (concluding that corporate officer who served as general manager and oversaw operations had actual and apparent authority to execute written employment agreement and bind the corporation).

Furthermore, the decision to enter into the Employment Agreement with Crandall was not the type of corporate decision that required approval by Alpha's shareholders. As noted above, Alpha had no bylaws in place until December 2018, and the bylaws that were adopted in December 2018 did not create any voting rights for shareholders over employment agreements.[6] Nor does the Business Code require

---

[6] Section 2.10 of Alpha's bylaws required shareholder approval only for:
  (a) The entry into any merger with or acquisition of another business or business entity, or other similar arrangement;
  (b) The sale, or contract to sell, or other disposal of all or substantially all of the Corporation's assets. . . .
  (c) The sale of 100% of the outstanding shares of stock in the Corporation to one or more persons or entities pursuant to a private sale or exchange or a series of related private sales or exchanges; or
  (d) The dissolution of the Corporation.

20

shareholder approval for employment agreements.[7] Consequently, El Shawa did not breach any fiduciary duties by declining to seek and obtain shareholder approval of the Employment Agreement.

Additionally, the evidence, viewed in the light most favorable to the judgment, showed that over the course of several months, El Shawa, in his capacity as CEO, negotiated with Crandall over the terms of his Employment Agreement and worked with Alpha's counsel to have the Agreement prepared. See OCGA § 14-2-842 (b) (2) (officer may rely on legal counsel).[8] As part of the negotiations, El Shawa rejected some of what was requested by Crandall, namely, Crandall's request to receive equity in Alpha as compensation. There also was evidence that the other two members of

---

[7] The Business Code requires shareholder approval only for certain major corporate acts, such as amendments to the articles of incorporation (OCGA § 14-2-1003); mergers or share exchanges with other corporations (OCGA §§ 14-2-1101 to 14-2-1103); conversion of a corporation to a limited liability company or limited partnership (OCGA § 14-2-1109.1); conversion of a corporation to a foreign limited liability company, foreign limited partnership, or foreign corporation (OCGA § 14-2-1109.3); sales of all or substantially all of a corporation's assets (OCGA § 14-2-1202); and corporate dissolution (OCGA § 14-2-1402).

[8] OCGA § 14-2-842 (b) (2) provides in part:
    In performing his or her duties an officer may rely upon . . . [i]nformation, data, opinions, reports, statements provided by . . . legal counsel . . . as to matters involving the skills, expertise, or knowledge reasonably believed to be reliable and within such person's professional or expert competence.

Alpha's Board were fully aware of El Shawa's actions, and that Sasnett, who served as Executive Vice President of Sales and as a Board member, assisted in the contractual negotiations. Moreover, Sasnett testified that in arriving at the terms of severance, they "were trying to do [their] due diligence to find out what was . . . customary within the marketplace[.]" There also was evidence that Crandall "had experience in launching new products in the past with other companies," such that it would be beneficial to Alpha if he accepted the new position and "took over the [sales component of the] new hereditary cancer testing, which would be women's health and oncology." Sasnett testified that Alpha wanted to ensure that Crandall remained at the company as it continued to grow, and Crandall testified that inclusion of the severance provisions in his Employment Agreement gave him the security he needed to remain at Alpha and take on the role of National Sales Director during a time of uncertainty over whether the company would be acquired or go public. This combined evidence, construed in favor of the judgment and in light of the presumption of good faith applicable in this context, supported a finding that El Shawa acted in good faith and for legitimate business reasons in negotiating and

executing the Employment Agreement on behalf of Alpha.[9] See OCGA §§ 14-2-830 (c); 14-2-842 (c); *Royal Crown Cos. v. McMahon*, 183 Ga. App. 543, 545 (1) (359 SE2d 379) (1987) (concluding that plaintiff's severance agreement that was contingent on a corporate change in control was valid and enforceable, where there was evidence that "the agreement was offered for the express purpose of protecting the shareholders by inducing the continued employment of plaintiff during a time of uncertainty when he might otherwise have been distracted by concerns for his own financial security to seek employment elsewhere"). And while there was conflicting testimony on these matters, it was "the function of the [trial court as the] trier of fact

---

[9] In their reply brief, the defendants assert that Crandall's execution of the Employment Agreement constituted a "director's conflicting interest transaction" under OCGA § 14-2-860 and an "officer's conflicting interest transaction" under OCGA § 14-2-864. Because these arguments were raised for the first time in the defendants' reply brief, we decline to consider them. See *City of Atlanta v. Mays*, 301 Ga. 367, 372 (3) (801 SE2d 1) (2017). Furthermore, the defendants do not quote or discuss the statutory definition of a director or officer "conflicting interest transaction" or explain how the facts in this case fit within the statutory definition of such a transaction. "Mere conclusory statements are not the type of meaningful argument contemplated by our rules," and the defendants therefore have abandoned their "conflicting interest transaction" argument on appeal. (Citation and punctuation omitted.) *In re Estate of Burkhalter*, 354 Ga. App. 231, 237 (2) (a) & n. 32 (840 SE2d 614) (2020). See *Woods v. Hall*, 315 Ga. App. 93, 96 (726 SE2d 596 (2012) (noting that "legal argument . . . requires, at a minimum, a discussion of the appropriate law as applied to the relevant facts," and pointing out that an assertion of error followed by a legal citation is not sufficient).

to resolve any conflicts in the testimony of witnesses," and "[w]e cannot substitute this [C]ourt's judgment for that of the trier of fact." *Bowen Builders Group v. Reed*, 252 Ga. App. 54, 56 (555 SE2d 745) (2001).

(b) With respect to Crandall, there was evidence to support the rejection of the defendants' allegations that Crandall breached any fiduciary duties he owed to Alpha shareholders in negotiating and executing his Employment Agreement.[10] Because Crandall had no authority to hire Alpha employees, set employees' salaries, or sign or approve employment contracts on Alpha's behalf, the present case is not one where a corporate officer sat on both sides of the transaction at issue. Nor is there any evidence that Crandall used his authority, leverage, or power as an officer to manipulate the contract negotiation process or to secure contractual terms harmful to Alpha. Rather, there was evidence, as previously discussed, reflecting that the negotiations over the Employment Agreement were arms-length and that the Agreement benefitted Alpha. Under these circumstances, the trial court was

---

[10] For purposes of our analysis, we assume without deciding that Crandall owed fiduciary duties to Alpha shareholders as a corporate officer when he was negotiating his new Employment Agreement, given that he had already started serving as National Sales Director while the Agreement was being negotiated and finalized.

authorized to conclude that Crandall did not breach any fiduciary duties by negotiating and executing his new Employment Agreement.

Additionally, the trial court was entitled to find that Crandall did not conspire or collude with El Shawa to facilitate El Shawa's own alleged self-dealing. In this regard, Crandall denied that El Shawa expressed that he wanted the Change-in-Control Provision in place because he was afraid of being removed as CEO, and Crandall testified that El Shawa never told him to keep the Employment Agreement secret. Crandall further testified that he discussed his Employment Agreement with Alpha's other Board members and the other National Sales Director, and that the Board never suggested to him that there was any impropriety in the Agreement. Crandall also described how his Employment Agreement was the product of negotiations between the parties and went through several versions, which conflicted with the defendants' theory that his Agreement was the product of collusion by the parties. Given this record, the trial court was entitled to reject the defendant's argument that Crandall conspired or colluded in El Shawa's alleged scheme of self-dealing. See *Tattersall Club Corp.*, 232 Ga. App. at 309 (1) (a) (concluding that the evidence supporting a finding that employment contract signed by officer was binding on corporation, where the evidence did not demand a finding that the plaintiff

25

employee and the officer who signed the employee's agreement "acted in collusion in creating the agreement"). See generally *Speed v. Muhanna*, 274 Ga. App. 899, 903 (1) (619 SE2d 324) (2005) ("The rule that a principal is liable for the contracts of his agent applies even though the agent, in contracting, acts in his own interests and adversely to his principal, where the party with whom the agent contracts has no knowledge of the agent's derelictions and is not cognizant of any fact charging him with knowledge thereof.") (citation and punctuation omitted). Cf. OCGA § 10-6-59 ("Where an agent shall conspire with the other party, his principal shall not be bound thereby nor charged with knowledge of facts thus acquired by his agent.").

For these combined reasons, the defendants' argument that the Employment Agreement was invalid and unenforceable as the result of breaches of fiduciary duty provides no basis for reversal of the judgment.

3. The defendants further argue that the trial court erred in entering judgment in favor of Crandall because at the time that Crandall terminated his Employment Agreement, there had been no change in control at Alpha so as to trigger severance pay under the Change-in-Control Provision. According to the defendants, Alpha was still an active company after the acquisition of its shares by ConGen, and El Shawa remained its CEO and Sasnett remained its Executive Vice President of Sales, even

26

as they took on new positions at ConGen. We conclude, however, that there was evidence to support the finding by the trial court that Sasnett changed roles after the acquisition.

As previously noted, the Change-in-Control Provision of Crandall's Employment Agreement defined a change in control as occurring upon "a change in the CEO and/or Executive Vice President of Sales of [Alpha]." And Crandall testified that while he previously reported to Sasnett as Executive Vice President of Sales at Alpha, after the Share Exchange Agreement went into effect in December 2018, he began reporting to Dakuras, who was the new Vice President of Sales and Operations. Sasnett confirmed at trial that in December 2018, "the sales force responsibilities were taken away from [him] and given to . . . Dakuras."

Sasnett also acknowledged that he changed his LinkedIn.com page to reflect that he no longer served as Executive Vice President of Sales for Alpha after December 2018; that his role at Alpha changed after December 2018 and he no longer received a salary from Alpha after that date; and that in January 2019, he executed a new employment agreement with ConGen under which he promised not to provide services to any other company without the prior written consent of ConGen.

27

Additionally, Sasnett testified that he no longer considered himself Alpha's Executive Vice President of Sales after the acquisition:

> Q: And did you remain the executive vice president for sales of that company even though your employment duties had shifted to ConGen? Did you still hold the title?
>
> A: That was not -- no, sir.
>
> Q: How was that title removed?
>
> A: I had no duties at Alpha so . . . .

The aforementioned testimony, construed in the light most favorable to the judgment, authorized a finding that Sasnett served as Alpha's Executive Vice President of Sales at the time that Crandall entered into his Employment Agreement, but then no longer occupied that position when Crandall terminated the Agreement. And while there was conflicting testimony regarding this matter, again, resolution of those conflicts was for the trial court, not this Court. *Bowen Builders Group*, 252 Ga. App. at 56. Accordingly, the trial court was authorized to find that there was a "a change in the . . . Executive Vice President of Sales of [Alpha]" under the Change-in-

Control Provision of the Employment Agreement, such that Crandall was entitled to seek severance benefits upon the termination of his employment.

4. ConGen maintains that the judgment entered against it should be reversed because it did not assume liability for breach of Crandall's Employment Agreement when it acquired all of the shares of Alpha.

The uncontroverted evidence showed that Congen acquired all of the shares of Alpha through the Share Exchange Agreement. Generally, when a company aquires all of the shares of another company, the purchasing company does not assume the liabilities of the selling company. See *Brown Transp. Corp. v. Street*, 194 Ga. App. 717, 719 (1) (391 SE2d 699) (1990) (holding that corporation that purchased all of another corporation's common stock did not render it responsible for the latter's liabilities, as "liability cannot be predicated merely because of the ownership of [the latter's] stock"); *Jerry Dickerson Presents, Inc. v. Concert/Southern Chastain Promotions*, 260 Ga. App. 316, 326 (2) (c) (579 SE2d 761) (2003) (noting that "a shareholder's sale of corporate stock, even 100 percent thereof, does not affect the viability and separate nature of the corporate entity, which exists independently of its shareholders"). See generally OCGA § 14-2-622 (b) ("Unless otherwise provided in the articles of incorporation, a shareholder of a corporation is not personally liable for

29

the acts or debt of the corporation except that he may become personally liable by reason of his own acts or conduct."); *Shelby Ins. Co. v. Ford*, 265 Ga. 232, 233 (454 SE2d 464) (1995) ("A corporation and even its sole owner are two separate and distinct persons. One person may own all the stock of a corporation, and still such individual shareholder and the corporation would, in law, be two separate and distinct persons.") (citations and punctuation omitted); *Williams Plaza v. Sedgefield Sportswear Div. of Blue Bell*, 164 Ga. App. 720, 722 (297 SE2d 342) (1982) (noting that fact that one company "is a wholly-owned subsidiary of the other . . . alone [is] not sufficient to overcome the fact that the two are separate and distinct entities in the eyes of the law"). Rather, a purchasing corporation assumes responsibility for the selling corporation's liabilities only if "(1) there is an agreement to assume liabilities; (2) the transaction is, in fact, a merger;[11] (3) the transaction is a fraudulent attempt

---

[11] To establish a "de facto" merger, four elements must be established: (1) a continuation of the seller corporation's enterprise, which involves a continuity of management, personnel, physical location, assets, and general business operations; (2) a continuity of shareholders which results from the purchasing corporation paying for the acquired assets with shares of its own stock, which ultimately comes to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation; (3) the cessation and dissolution of the seller corporation as soon as legally and practically possible; and (4) the assumption by the purchaser of those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of

to avoid liabilities; or (4) the purchaser is a mere continuation of the predecessor corporation.[12]" (Citation and punctuation omitted.) *Brown Transp. Corp.*, 194 Ga. App. at 719 (1). See *Bullington v. Union Tool Corp.*, 254 Ga. 283, 284 (328 SE2d 726) (1985).

In determining whether ConGen assumed the liabilities of Alpha when it purchased all of Alpha's shares, the trial court did not analyze the question under the aforementioned framework. Moreover, while the trial court referred to the transaction as being both "in the form of a share exchange agreement" and as creating a "merged corporation," the uncontroverted evidence showed that the transaction was a statutory share exchange under which ConGen acquired all of Alpha's shares (see OCGA § 14-2-1102) rather than a statutory merger (see OCGA § 14-2-1101), and the trial court did not apply the "de facto" merger test, as set out supra in footnote 11, in addressing

---

normal business operations of the seller corporation.
(Citations and punctuation omitted.) *POP 3 Ravinia v. Embark Holdco Mgmt.*, 364 Ga. App. 414, 423-424 (2) (875 SE2d 401) (2022).

[12] Under the common law continuation doctrine, "the new corporation assumes the liabilities of the old corporation when the new corporation, with the same or similar owners, continues the old corporation's business," and "the doctrine applies when the old and new corporations share both (a) a substantial identity of ownership and (b) a complete identity of the objects, assets, shareholders, and directors." (Citations and punctuation omitted.) *POP 3 Ravinia*, 364 Ga. App. at 418 (1).

31

the issue. Accordingly, we vacate the trial court's judgment in part and remand for the court to consider whether ConGen assumed the liabilities of Alpha, including liability for breach of the Employment Agreement, under the proper legal framework. See *Coleman v. DaimlerChrysler Svcs. of North America*, 276 Ga. App. 336, 339 (623 SE2d 189) (2005) (vacating and remanding for consideration of the appropriate legal factors).

5. The defendants also contend that Crandall was barred from bringing suit under an indemnification provision contained in the Share Exchange Agreement, and that the Change-in-Control Provision of the Employment Agreement was unenforceable because it violated EKRA, 18 USC § 220. However, as noted by the defendants, they raised these arguments in the court below, but the trial court did not address them in its judgment. "This [C]ourt is for the correction of errors of law, and where the trial court has not ruled on an issue, we will not address it." (Citation and punctuation omitted.) *Williamson v. Strickland & Smith*, 296 Ga. App. 1, 6 (7) (673 SE2d 858) (2009). "And this rule applies even where a party raised and argued an issue below, but the trial court declined to address the issue in its order." *Sherman v. Dev. Auth. of Fulton County*, 320 Ga. App. 689, 695 (4) (740 SE2d 663) (2013). The defendants' "arguments are therefore beyond our proper scope of review until the trial

court rules on them." (Citation and punctuation omitted*.) First Merit Credit Svcs. v. Fairway Aviation*, 359 Ga. App. 829, 836 (2) (860 SE2d 126) (2021). On remand, the trial court should address these remaining issues. See *Baars v. Freeman*, 288 Ga. 835, 840 (2) (c) (708 SE2d 273) (2011).

*Judgment affirmed in part, vacated in part and case remanded with direction. Land and Watkins, JJ., concur*.